**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JEANENE HARLICK,
        *Plaintiff-Appellant,*

v.

BLUE SHIELD OF CALIFORNIA,
        *Defendant-Appellee.*

No. 10-15595

D.C. No.
3:08-cv-03651-SC

OPINION

Appeal from the United States District Court
for the Northern District of California
Samuel Conti, Senior District Judge, Presiding

Argued and Submitted
May 11, 2011—San Francisco, California

Filed August 26, 2011

Before: William A. Fletcher and N. Randy Smith,
Circuit Judges, and Richard Mills, Senior District Judge.*

Opinion by Judge William A. Fletcher

---

*The Honorable Richard Mills, Senior District Judge for the U.S. District Court for Central Illinois, Springfield, sitting by designation.

16405

---

## COUNSEL

Lisa S. Kantor, Elizabeth K. Green, KANTOR & KANTOR, Northridge, California, for the plaintiff-appellant.

Adam Pines, Joanna Sobol McCallum, MANATT, PHELPS & PHILLIPS, LLP, Los Angeles, California, for the defendant-appellee.

---

## OPINION

W. FLETCHER, Circuit Judge:

Plaintiff Jeanene Harlick suffers from anorexia nervosa. The question before us is whether Blue Shield was required to pay for her care at a residential treatment facility, either under the terms of her insurance plan or under California's Mental Health Parity Act. We conclude that her insurance plan does not so require, but that the Mental Health Parity Act does.

### I.   Background

### A.   Harlick's Treatment at Castlewood

Jeanene Harlick, who is now 37 years old, has suffered from anorexia for more than twenty years. In early 2006,

when she was a clerk at the Pacific Construction & Manufacturing Company, she relapsed and began undergoing intensive outpatient treatment. She was then enrolled in the company's health insurance plan through Blue Shield ("the Plan"), which paid for the treatment.

In March 2006, Harlick's doctors told her that she needed a higher level of care than the intensive outpatient treatment then being provided. Blue Shield employees told Harlick on the telephone that residential treatment was not covered under her Plan, but that partial or inpatient (full-time) hospitalization would be covered if Blue Shield determined that it was medically necessary. Blue Shield employees gave Harlick the names of several facilities where such treatment might be covered. Harlick and her doctors ultimately determined that none of the in-network facilities suggested by Blue Shield could provide effective treatment, so she registered at Castlewood Treatment Center, a residential treatment facility in Missouri that specializes in eating disorders. When Harlick entered Castlewood, she was at 65% of her ideal body weight. When she had been there less than a month, a feeding tube was inserted because her "caloric level needed to gain weight was so high." Harlick stayed at Castlewood from April 17, 2006 to January 31, 2007.

According to Castlewood's website, it is a "Residential Treatment Facility and Day Hospital program for individuals needing comprehensive treatment for anorexia nervosa, bulimia nervosa, and binge eating disorders." Six levels of care are available at Castlewood. In increasing order of intensity, they are a community support group, an outpatient program, an intensive outpatient program, day treatment, "Step Down" or partial hospitalization, and residential care. Every week, patients in residential care have four sessions with an individual therapist, one session with a psychiatrist, one session with a nutritionist, and many hours of group therapy. Castlewood staff members are on-site 24 hours a day, and they plan patients' meals, monitor patients' food intake and

kitchen use, provide dietary supplements, and maintain feeding tubes. Castlewood specializes in the treatment of those who, like Harlick, have multiple mental illnesses and have failed in other treatment programs. Several staff members at Castlewood have graduate degrees in psychology, but none of the staff members is a medical doctor or a nurse.

Castlewood is consistently described as a "residential" community on its website. In an FAQ section of the website discussing insurance, potential patients are told to ask their insurance companies about available benefits for "[r]esidential, mental health, non-substance abuse" treatment. The website says that "Castlewood . . . is licensed as a 'Residential' facility, so it is important to obtain the residential benefit and not simply the 'inpatient' benefit, as they might be different." The website also says that many states "have 'parity' laws, which means that the eating disorder could potentially be covered on par with medical benefits."

## B.   The Plan

For mental illnesses, Harlick's insurance plan covers inpatient services, limited outpatient services, office visits, psychological testing, and in-person or telephone counseling sessions. Inpatient services are covered "in connection with hospitalization or psychiatric Partial Hospitalization (day treatment)." Inpatient services for treatment of mental illnesses are discussed three times in the Plan. Each time, the Plan says that "[r]esidential care is not covered." "Residential care" is not defined anywhere in the Plan.

For physical illnesses, the Plan covers extensive hospital treatment, outpatient treatments, and office visits. It also covers certain forms of "subacute care." Subacute care is defined as "skilled nursing or skilled rehabilitation provided in a Hospital or Skilled Nursing Facility to patients who require skilled care such as nursing services, physical, occupational or speech therapy, a coordinated program of multiple therapies

or who have medical needs that require daily Registered Nurse monitoring." A Skilled Nursing Facility ("SNF") is defined as "a facility with a valid license issued by the California Department of Health Services as a Skilled Nursing Facility or any similar institution licensed under the laws of any other state, territory, or foreign country." The Plan provides coverage for up to 100 days at an SNF.

### C.    Blue Shield's Coverage Decision

Blue Shield paid for the first eleven days of Harlick's treatment at Castlewood, but then refused to pay for the rest of her treatment. Blue Shield conducted several internal reviews of Harlick's claim, and Blue Shield employees engaged in extensive correspondence with Harlick and her mother, Robin Watson, about her claim.

On September 20, 2006, Blue Shield employee Bruce Berg reviewed Harlick's record and recommended denying the claim in an internal document that was not sent to Harlick or Watson. Berg wrote, "[T]his appears to be residential care as stated in the consent to treatment/treatment plan. . . . Residential treatment is not a benefit."

On December 8, 2006, Blue Shield employee David Battin reviewed the claim in another internal document. Battin concluded that "[t]he principal reason" for the denial was that Harlick's plan did not cover residential care. A few days later, on December 12, 2006, Blue Shield employee Risell Tachin-Salazar wrote to Harlick and denied the claim based on Battin's review, explaining that Harlick did not have a benefit for residential care.

On January 19, 2007, Blue Shield employee Carroll Cederberg reviewed the claim in another internal document. Cederberg again concluded that residential care was not a covered benefit under Harlick's Plan.

On March 27, 2007, David Battin reviewed the claim again in another internal document. He concluded:

> The principal reason [for the denial] is that these services are not a covered benefit. As per your health plan's Evidence of Coverage (EOC); all inpatient psychiatric hospital care must be prior authorized by the Mental Health Services Administrator (MHSA), except for emergency care. Since you specifically traveled to Missouri to be admitted to this particular facility, this would not be considered as an emergency admission. You also had amble [sic] time to contact MHSA for authorization prior to your admission. In addition; [sic] residential care (room and board) is not a covered benefit. During the dates of service 4/28/06 to 8/25/06 the medical necessity of being treated as an inpatient was not established, you could have been treated as an outpatient. Since your EOC does not cover room and board, the facility fees for your residential treatment . . . are not a covered benefit.

Battin also wrote that professional fees incurred at Castlewood, such as psychologists' fees, would be covered if Blue Shield found that the professional treatment was medically necessary. A few days later, on April 6, 2007, Blue Shield employee Mary Anne Gomez sent a letter to Harlick that repeated Battin's statements nearly verbatim.

On April 30, 2007, Blue Shield employee Carolyn Garner wrote to Harlick, reiterating that coverage for treatment at Castlewood had been denied because Harlick's plan did not cover residential treatment. Garner corrected two errors in Gomez's April 6 letter. First, she explained that the preauthorization requirement did not apply to facilities outside California. Second, she explained that professional fees incurred at Castlewood would not be covered unless the professionals billed Blue Shield independently. Since Castlewood charged

a global fee that included professional fees, Blue Shield would not cover those fees. Finally, in response to an inquiry from Harlick's mother, Robin Watson, Garner wrote that California's mental heath parity law did not require Blue Shield to cover treatment at Castlewood. Garner wrote that the Plan did not cover any residential treatment, "whether the diagnosis is for a mental health condition or a medical condition," so there was no violation of the parity law.

On May 2, 2007, according to Watson, Blue Shield employee Mary Anne Gomez suggested to Watson on the telephone that Blue Shield might, in fact, cover professional fees from Castlewood, and told her to separate claims for professional fees from claims for room and board.

On August 3, 2007, Blue Shield employee Joan Russo wrote a detailed letter to Watson clarifying inconsistencies in previous letters and reiterating the reasons for the denial. She repeated that the claim had been denied because residential facilities were not covered. She explained, for the first time, that Blue Shield had paid for the first eleven days at Castlewood because of a "coding error." According to Russo, the coder used "a procedure code that did not identify the claim as a mental health diagnosis," so it was paid automatically. Finally, Russo said that professional fees would not be covered. The letter stated that it was the final decision in Harlick's administrative appeal.

Blue Shield eventually did pay for professional fees incurred at Castlewood. It has never paid for the rest of her treatment at Castlewood.

### D.   DMHC review

Frustrated by Blue Shield's refusal to pay, Watson filed a complaint with California's Insurance Commissioner. Her letter was forwarded to the California Department of Managed Health Care, where Senior Counsel Andrew George investi-

gated the complaint. George wrote to Blue Shield and asked, among other things: (1) why Harlick had been told that residential care was not medically necessary; (2) why Harlick was told that benefits would be denied because care was not pre-authorized, even though the Plan clearly stated that lack of preauthorization resulted only in a $250 penalty; and (3) whether Castlewood could be covered as an SNF. After talking to Russo, George concluded that "although [Harlick] ha[d] been provided with conflicting information from the Plan regarding its basis for denial," Blue Shield had denied coverage because Harlick's Plan did not cover residential care.

## E.    Proceedings in the District Court

On October 31, 2008, Harlick filed a complaint in federal district court. On March 4, 2010, the district court granted Blue Shield's motion for summary judgment and denied Harlick's motion for summary judgment. The court found that Harlick's Plan unambiguously excluded coverage for residential care and that, while the Plan did cover care at Skilled Nursing Facilities, Castlewood was not an SNF. The court did not reach the question whether California's Mental Health Parity Act required coverage of Harlick's residential treatment at Castlewood.

## II.    Standard of Review

We review *de novo* the district court's decision on coverage provided by an ERISA plan. *Nolan v. Heald Coll.*, 551 F.3d 1148, 1153 (9th Cir. 2009) Like the district court, we review the plan administrator's decision whether to grant benefits for abuse of discretion. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 959 (9th Cir. 2006) (en banc). In the ERISA context, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine

dispute of material fact exists, do not apply." *Nolan,* 551 F.3d at 1154 (internal quotation marks and citation omitted).

### III.   Discussion

### A.   Plan Coverage of Residential Care

For the reasons that follow, we conclude that Harlick's Plan does not itself provide coverage for her residential care at Castlewood.

### 1.   Review for Abuse of Discretion

**[1]** When we review an ERISA plan administrator's denial of benefits, the standard of review depends on whether the plan explicitly grants the administrator discretion to interpret the plan's terms. *Abatie*, 458 F.3d at 967. The parties agree that Harlick's plan did grant Blue Shield such discretion. We therefore review Blue Shield's decision for abuse of discretion. *Id.* However, our review is "tempered by skepticism" when the plan administrator has a conflict of interest in deciding whether to grant or deny benefits. *Id.* at 959, 968-69. In such cases, the conflict is a "factor" in the abuse of discretion review. *Abatie*, 458 F.3d at 966-68; *accord Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). The weight of that factor depends on the severity of the conflict. *Abatie*, 458 F.3d at 968; *Glenn*, 554 U.S. at 108, 115-117.

**[2]** A conflict arises most frequently where, as here, the same entity makes the coverage decisions and pays for the benefits. This dual role always creates a conflict of interest, *Glenn*, 554 U.S. at 108, but it is "more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision." *Id.* at 117. The conflict is less important when the administrator took "active steps to reduce potential bias and to promote accuracy," *id.*, such as employing a "neutral, independent review process," or segregating employees who make coverage decisions from those who deal with the

company's finances. *Abatie*, 458 F.3d at 969 n.7. The conflict is given more weight if there is a "history of biased claims administration." *Glenn*, 554 U.S. at 117. Our review of the administrator's decision is also tempered by skepticism if the administrator gave inconsistent reasons for a denial, failed to provide full review of a claim, or failed to follow proper procedures in denying the claim. *See Lang v. Long-Term Disability Plan*, 125 F.3d 794, 798-99 (9th Cir. 1997); *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110 (9th Cir. 1999).

Harlick points to four factors that she argues should result in our review of Blue Shield's decision being tempered by skepticism: (1) Blue Shield both makes coverage decisions and pays benefits; (2) Blue Shield gave inconsistent reasons for its denial of Harlick's claim; (3) Blue Shield "never explained why the California Mental Health Parity Act did not require payment of [the] claim"; and (4) Blue Shield excluded "residential treatment" from the Plan's coverage without defining the term. We take these factors in turn.

First, Blue Shield concedes that as plan administrator it both makes coverage decisions and pays benefits. However, the record does not indicate whether Blue Shield has a history of bias in claims administration or whether it has taken any steps to promote accurate decisionmaking. *See Glenn*, 554 U.S. at 117; *Abatie*, 458 F.3d at 969 n.7.

Second, Blue Shield also concedes that it gave Harlick inconsistent information about why it would not pay for her treatment at Castlewood. But Blue Shield argues that its mistakes were minor and quickly corrected. We disagree. Watson spoke several times to Blue Shield's call center employees. According to Watson, they gave her no useful information about whether treatment at Castlewood would be covered. When Harlick entered Castlewood, Blue Shield paid without complaint for eleven days, and then abruptly stopped paying. It took more than a year for Blue Shield to explain that it had paid for the first eleven days because of a "coding error." Har-

lick and Watson received four letters from four different Blue Shield representatives explaining why treatment at Castlewood was not covered. The first letter said that residential treatment was not covered. The second letter said that residential treatment was not covered, that treatment was not pre-authorized, and that treatment was not medically necessary, but that professional fees might be covered. The third letter said that residential treatment and professional fees were not covered. An employee then told Watson on the telephone that professional fees might be covered. The fourth letter said that residential treatment was not covered and professional fees were not covered. Blue Shield eventually paid the professional fees. While there is no evidence indicating that Blue Shield changed its explanations in bad faith, or suggesting that Blue Shield was determined to deny Harlick's claim regardless of its validity, the combined effect of its communications to Harlick and Watson was confusing and frustrating.

Third, Harlick argues that Blue Shield failed to explain why the Mental Health Parity Act did not require coverage. This assertion is contradicted by the record. Caroyln Garner explained in her April 30 letter why Blue Shield believed that the Act did not require coverage.

Fourth, it is true that Blue Shield denied coverage for "residential care" without ever defining the term. As discussed below, however, we discern no real ambiguity in the meaning of "residential care" in Harlick's Plan, and there is no indication that Blue Shield exploited any uncertainty about the meaning of "residential care." *Compare Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1162 & n.33 (9th Cir. 2001) (an employer may not exploit uncertainty that it has created).

**[3]** The net effect is that our review of Blue Shield's denial of coverage is for abuse of discretion, but tempered by some skepticism because of Blue Shield's structural conflict and its changing explanations for denying coverage.

### 2.  Coverage Under the Plan

Harlick makes two arguments in support of her contention that the Plan covers her treatment at Castlewood. First, she argues that the Plan covers residential care. Second, she argues, in the alternative, that her care at Castlewood qualifies for coverage as care at a Skilled Nursing Facility. We find both arguments unpersuasive.

### a.  Residential Care

An ERISA plan is a contract that we interpret "in an ordinary and popular sense as would a [person] of average intelligence and experience." *Gillam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007) (internal quotation marks and citation omitted). We look first to the "explicit language of the agreement to determine, if possible, the clear intent of the parties," and then to extrinsic evidence. *Id.* (internal quotation marks and citation omitted). Harlick argues that the term "residential care" is ambiguous for two reasons. First, she argues that "residential care" has no defined meaning in the Plan document. Second, she argues that the exclusion of residential care is unclear because of its placement in the Plan. Specifically, she points out that the exclusion of "residential care" occurs in the sections of the Plan that deal with inpatient hospital care, suggesting that Blue Shield intended to exclude coverage for residential care only in the context of hospitals.

[4] Harlick's own evidence shows, however, that "residential care" has a well-established meaning in the context of the treatment of mental illness, particularly eating disorders. Castlewood's website calls Castlewood a "residential treatment facility." An FAQ on Castlewood's website explains that Castlewood "is licensed as a 'Residential' facility, so it is important to obtain the residential benefit." Harlick argues in her opening brief that "residential treatment center" is one of "five critical levels of care which should be considered for patients with an eating disorder," and she quotes several pro-

fessional associations opining on the importance of residential care for eating disorders. A survey done by the California Department of Managed Health Care, discussed below, specifically addresses coverage for residential care for eating disorders. There may be disputes at the margin about what qualifies as residential care, and it is certainly preferable for a Plan to define key terms. But there is no evidence of actual confusion in this case about whether treatment at Castlewood was "residential care."

We also disagree that the placement of the exclusion was confusing. Every time the Plan says anything about inpatient care for mental illness, it specifies that residential care is not a covered benefit. The Plan states three times that residential care is not covered. First, it states that "inpatient services" are covered when they are connected with hospitalization, but that "[r]esidential care is not covered." Second, it states that "[r]esidential care is not covered" in the section describing payment responsibilities for inpatient professional and physician services. Third, it states that "[r]esidential care is not covered" in the section describing payment responsibilities for inpatient hospital treatment.

**[5]** Blue Shield could have organized the Plan document more clearly — for example, it could have put an exclusion for residential care in the "Principal Limitations" section — but the current organization is neither illogical nor misleading. Residential care is a type of inpatient care. A Plan subscriber wanting to know whether residential care is covered would go to the sections of the Plan describing coverage for inpatient care, and would discover, each time inpatient care is mentioned, a statement that residential care is not covered. Since the entire section of the Plan dealing with treatment of mental illness is only six pages long, these statements are not difficult to find. We believe that a person "of average intelligence and experience" would have no trouble concluding that the Plan does not cover residential care. *Compare Saltarelli v. Bob Baker Group Med. Trust*, 35 F.3d 382, 385-87 (9th Cir.

1994) (holding that placement of exclusion was so inexplicable that exclusion was unenforceable).

### b.    Skilled Nursing Facility

**[6]** Harlick argues, in the alternative, that Castlewood is a Skilled Nursing Facility under the Plan. Harlick's Plan covers a maximum of 100 days of treatment each year at an SNF. A "Skilled Nursing Facility" is defined in the Plan as "a facility with a valid license issued by the California Department of Health Services as a Skilled Nursing Facility or any similar institution licensed under the laws of any other state, territory, or foreign country." The California licensing statute defines an SNF as "a health facility that provides skilled nursing care and supportive care to patients whose primary need is for availability of skilled nursing care on an extended basis." Cal. Health & Safety Code § 1250(c). Among other things, an SNF in California must have "at least one registered nurse or a licensed vocational nurse, awake and on duty, in the facility at all times, day and night." 22 Cal. Admin. Code § 72329(b)-(d).

Missouri, where Castlewood is located, also licenses SNFs. Under Missouri law, an SNF is

> any premises, other than a residential care facility, assisted living facility, or an intermediate care facility, which is utilized by its owner, operator, or manager, to provide for twenty-four (24) hour accommodation, board and skilled nursing care and treatment services to at least three (3) residents . . . Skilled nursing care and treatment services are those services commonly performed by or under the supervision of a registered professional nurse for individuals requiring twenty-four (24) hours a day care by licensed nursing personnel including acts of observation, care, and counsel of the aged, ill, injured, or infirm, the administration of medications and treat-

> ments as prescribed by a licensed physician or den-
> tist, and other nursing functions requiring substantial
> specialized judgment and skill.

19 Mo. Code of State Regulations § 30-83.010(49).

**[7]** Castlewood has no registered nurses, licensed voca-
tional nurses, or any other nurses on its staff. It therefore does
not qualify as an SNF under either California or Missouri law.

**[8]** Harlick points out that the Plan covers SNFs licensed
in California and "any similar institution licensed under the
laws of any other state, territory, or foreign country." She
argues that Castlewood is a "similar institution" to an SNF,
providing care for mental rather than physical illness. Castle-
wood may provide mental illness care that is analogous to the
physical illness care that is provided in an SNF, but this does
not mean that it is a "similar institution" to an SNF within the
meaning of the Plan. The most natural reading of the Plan's
language is that the Plan covers SNFs in California, as well
as institutions in other states that provide around-the-clock
nursing care for physical illnesses, even if they are given a
different name in those states. It was not an abuse of discre-
tion for the Plan administrator to conclude that Castlewood
was not an SNF or a "similar institution licensed under the
laws of any other state" within the meaning of the Plan.

### B.   Mental Health Parity Act

For the reasons that follow, we conclude that the Mental
Health Parity Act requires that a plan within the scope of the
Act provide all "medically necessary treatment" for "severe
mental illnesses," and that Harlick's residential care at Castle-
wood was medically necessary.

### 1.   Overview of the Act

**[9]** The California Mental Health Parity Act ("Parity Act"
or "Act") was enacted in 1999. In enacting the statute, the

California legislature found that "[m]ost private health insurance policies provide coverage for mental illness at levels far below coverage for other physical illnesses." 1999 Cal. Legis. Serv. ch. 534 (A.B.88), § 1 (West). The legislature further found that coverage limitations had resulted in inadequate treatment of mental illnesses, causing "relapse and untold suffering" for people with treatable mental illnesses, as well as increases in homelessness, increases in crime, and significant demands on the state budget. *Id.*

To combat this disparity, the Parity Act provides, in pertinent part:

> (a) Every health care service plan contract issued, amended, or renewed on or after July 1, 2000, that provides hospital, medical, or surgical coverage *shall provide coverage for the diagnosis and medically necessary treatment of severe mental illnesses* of a person of any age . . . under the same terms and conditions applied to other medical conditions as specified in subdivision (c).

> (b) These benefits shall include the following:

> > (1) Outpatient services.

> > (2) Inpatient hospital services.

> > (3) Partial hospital services.

> > (4) Prescription drugs, if the plan contract includes coverage for prescription drugs.

> (c) The terms and conditions applied to the benefits required by this section, that shall be applied equally to all benefits under the plan contract, shall include, but not be limited to, the following:

(1) Maximum lifetime benefits.

(2) Copayments.

(3) Individual and family deductibles.

(d) For the purposes of this section, "severe mental illnesses" shall include:

. . . .

(8) Anorexia nervosa.

Cal. Health & Safety Code § 1374.72 (emphasis added). It is undisputed that Harlick's Plan "provides hospital, medical, or surgical coverage" and so comes within the scope of the Act.

**[10]** Subsection (a) contains the Act's basic mandate. Briefly summarized, subsection (a) states that all plans that come within the scope of the Act "shall provide coverage for . . . medically necessary treatment of severe mental illnesses," including anorexia nervosa. That is, if treatment for a covered mental illness is "medically necessary," a plan that comes within the scope of the Act must pay for that treatment.

Subsection (a) contains only one limitation on this basic mandate: coverage for mental illnesses must be provided "under the same terms and conditions applied to other medical conditions as specified in subdivision (c)." The parties agree that the phrase "terms and conditions" refers to monetary conditions, such as copayments and deductibles. Thus, the requirement that plans cover treatment for mental and physical illnesses "under the same terms and conditions" means that plans must apply the same copayments, deductibles, and other financial terms to both types of treatment. For instance, if a plan caps lifetime benefits at $1 million for physical illnesses, it can cap total lifetime benefits — whether for treatment of mental or physical illnesses — at $1 million.

Subsection (b) states that "[t]hese benefits" must be offered by a plan that comes within the scope of the Act, and lists four specific required benefits. The wording of subsection (b) is confusing. The phrase "*these* benefits" suggests that subsection (b) refers back to subsection (a), but subsection (a) never uses the word "benefits." Harlick contends, and we agree, that the phrase "these benefits" refers to the phrase "coverage for the diagnosis and medically necessary treatment." Thus, the required coverage "shall include" all the benefits listed in subsection (b) — outpatient, inpatient, and partial hospital services, and, in some circumstances, prescription drug services. As we discuss below, the list of benefits in subsection (b) is not exhaustive.

Subsection (c) gives three illustrative examples of "terms and conditions" that must apply equally to coverage for mental and physical illnesses: maximum lifetime benefits, copayments, and deductibles. As explained above, the parties agree that "terms and conditions" refers only to financial terms and conditions.

Finally, subsection (d) lists nine specific "severe mental illnesses" for which coverage for "medically necessary treatment" is required, including anorexia nervosa.

**[11]** In summary, plans that come within the scope of the Act must cover all "medically necessary" treatment for the nine listed mental illnesses, but can apply the same financial limits — such as yearly deductibles and lifetime benefits — that are applied to coverage for physical illnesses.

### 2.    Benefits Required under the Parity Act

**[12]** Blue Shield contends that residential care is not a benefit that it must provide under the Parity Act, even if such care is medically necessary. A more detailed examination of the statute and accompanying regulation is necessary to understand Blue Shield's argument and why it is incorrect.

The district court did not reach this question. Because the parties presented the issue both to the district court and to us, and because the record is developed, it is appropriate for us to reach it. *See Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1117-18 (9th Cir. 2002).

### a.    Statutory and Regulatory Text

**[13]** We begin with the text of the Parity Act and its implementing regulation. *See United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008). Subsection (b) of the Act provides that "benefits shall include" outpatient services, inpatient hospital services, partial hospitalization services, and prescription drugs if the plan includes coverage for prescription drugs. Thus, the coverage required under subsection (a) must include, at a minimum, those four treatments. Subsection (b) does not mention "residential care" as a covered benefit, so a threshold question is whether the list of benefits in subsection (b) is an exhaustive list of treatments that can qualify as "medically necessary."

Subsection (b) says that benefits "shall include" the four listed treatments, but it does not explicitly say whether the list is exhaustive. By contrast, the list of "terms and conditions" in subsection (c) of the Act is explicitly characterized as a non-exhaustive list. Cal. Health & Safety Code § 1374.72(c) ("The terms and conditions . . . shall include, but not be limited to, the following."). At least two district courts have concluded that the difference in wording means that the list of benefits in subsection (b) is exhaustive. *Wayne W. v. Blue Cross of Cal.*, No. 1:07-CV-00035, 2007 WL 3243610, at *4 (D. Utah Nov. 1, 2007); *Daniel F. v. Blue Shield of Cal.*, No. C09-2037, 2011 WL 830623, at *8-9 (N.D. Cal. Mar. 3, 2011).

**[14]** However, the California Department of Managed Health Care ("DMHC"), which is responsible for implementing the Parity Act, has promulgated a regulation that makes

clear that the list of benefits in subsection (b) is not exhaustive. The regulation provides:

> The mental health services required for the diagnosis, and treatment of conditions set forth in Health and Safety Code section 1374.72 [the Parity Act] shall include, when medically necessary, all health care services required under the Act *including, but not limited to*, basic health care services within the meaning of Health and Safety Code sections 1345(b) and 1367(I), and section 1300.67 of Title 28.

28 Cal. Admin. Code § 1300.74.72(a) (emphasis added). The words "including, but not limited to" in the regulation make clear that the list of benefits in subsection (b), as well as the "basic health care services" specified in the regulation, are illustrative rather than exhaustive.

Apparently recognizing that the lists in the Act and the regulation are not exhaustive, Blue Shield argues in its brief that "a particular 'medically necessary' treatment must be provided for the treatment of severe mental illness if: (1) it is a level of care specified in subsection (b) of the Parity Act; (2) it is a 'basic health care service' required under Cal. Health & Safety Code § 1345(b) . . . ; *or* (3) it is an additional (non-mandated) benefit that the plan has chosen to provide for the treatment of physical conditions." Blue Shield's argument has two steps: first, that plans need not cover all medically necessary treatment under the Parity Act, and, second, that Blue Shield's three-prong test determines whether a given medically necessary treatment must be covered. We disagree with both steps.

In support of the first step of its argument that it need not cover all "medically necessary treatment" for the listed severe mental illnesses, Blue Shield points out that the Knox-Keene Act — the portion of the Health and Safety Code that regulates health insurance plans generally — does not require that

health care plans cover all medically necessary treatments for physical illnesses. Cal. Health & Safety Code §§ 1345(b), 1367(I); 28 Cal. Admin. Code § 1300.67. It contends that the DMHC's implementing regulation shows that the Parity Act is intended to parallel the Knox-Keene Act. It writes in its brief to us:

> [The regulation] states that the mental health services required under the Parity Act "shall include, when medically necessary, all health care services *required under the [Knox-Keene] Act*, including, but not limited to, *basic health care services* within the meaning of [the statutory provisions]."

(Quoting 28 Cal. Admin. Code § 1300.74.72(a); italics, *[Knox-Keene]*, and [the statutory provisions] added by Blue Shield in its brief.)

Blue Shield inserted the bracketed phrase "[Knox-Keene]" in its quotation of the regulation. Based on its assumption that the regulation refers to the Knox-Keene Act, Blue Shield argues that coverage under the Parity Act is intended to parallel coverage under the Knox-Keene Act. We believe that Blue Shield misreads the regulation. In our view, the "Act" to which the regulation refers is the Parity Act. The regulation states that "mental health services" for "treatment of conditions set forth in Health & Safety Code section 1374.72 [the Parity Act] shall include, when medically necessary, all health care services required under the Act . . . ." The word "Act," coming immediately after an explicit reference to the Parity Act, is most reasonably read as referring to the Parity Act. Without Blue Shield's alteration, nothing in the text of the statute or the regulation suggests that the scope of the Parity Act is equivalent to the scope of the Knox-Keene Act.

The second step of Blue Shield's argument is based on its assumption that the Parity Act does not require plans to cover all medically necessary treatment for severe mental illnesses.

Blue Shield contends that if a benefit is not listed in subsection (b) of the statute, and is not a "basic healthcare service" specified in the regulation, it is not required by the Act unless it is "an additional (non-mandated) benefit that the plan has chosen to provide for the treatment of physical conditions." Because Blue Shield's Plan "has [not] chosen to provide for" residential treatment for physical illness, Blue Shield contends that it need not cover Harlick's residential treatment for anorexia.

Blue Shield's three-prong test has no support in the Act. It can point to nothing in the text of the statute, the statutory scheme, or the implementing regulation to suggest that benefits under subsection (b) (as opposed to terms and conditions under subsection (c)) must be the same for physical and mental illnesses. Blue Shield's argument also lacks any support in common sense. Some medically necessary treatments for severe mental illness have no analogue in treatments for physical illnesses. For example, it makes no sense in a case such as Harlick's to pay for 100 days in a Skilled Nursing Facility — which cannot effectively treat her anorexia nervosa — but not to pay for time in a residential treatment facility that specializes in treating eating disorders.

Moreover, subsection (b)(4) of the Parity Act suggests that Blue Shield's interpretation is wrong. Subsection (b)(4) provides that plans within the scope of the Act must cover "[p]rescription drugs, if the plan contract includes coverage for prescription drugs." The legislature thus specified that a plan need not cover prescription drugs for mental illnesses, even if they are medically necessary, unless the plan covers such drugs for physical illnesses. The fact that the legislature carved out a specific exemption for prescription drugs indicates that all other types of benefits must be provided whenever they are medically necessary, whether or not that type of benefit is covered for physical illnesses.

Although there is no caselaw directly on point, a recent opinion from the California Court of Appeal supports our

conclusion. In *Arce v. Kaiser Foundation Health Plan, Inc.*, 181 Cal. App. 4th 471 (2010), the issue was the certification of a plaintiff class in a suit under the Parity Act. The court had no occasion to explicitly hold that the phrase "medically necessary treatment" in the Act means *all* medically necessary treatment, but the court's analysis appears to assume that this is the meaning of the Act. The court wrote:

> In sustaining [Kaiser's] demurrer, it appears that the trial court assumed that Arce could only prove a violation of the Mental Health Parity Act if he could demonstrate that the therapies at issue were medically necessary for the putative class members and that Kaiser denied coverage based on a determination that they were not. While that is one means of establishing a violation [of] the statute, it is not the exclusive means. It is possible that Arce also could prove a statutory violation by showing that Kaiser categorically denies coverage for mental health care services that may, in some circumstances, be medically necessary . . . for its individual plan members.

*Id.* at 493.

### b.    Positions Taken by the Department of Managed Health Care

**[15]** Seeking to avoid the import of the statutory and regulatory texts, Blue Shield contends that the California Department of Managed Health Care ("DMHC") has taken the position that the Parity Act does not require that all "medically necessary treatments" for enumerated "severe mental illnesses" be covered. It is more accurate to say that the DMHC has taken more than one position on this issue.

Under California law, the deference a court should accord to an agency's interpretation of a statute is "fundamentally situational." *Yamaha Corp. of Am. v. State Bd. of Equalization*,

19 Cal. 4th 1, 12 (1998) (emphasis omitted). Judicial deference to an agency's interpretation "turns on a legally informed, commonsense assessment of [its] contextual merit." *Id.* at 14. A court should consider factors "indicating that the agency has a comparative interpretive advantage over the courts" and factors "indicating that the interpretation in question is probably correct." *Id.* at 12 (internal quotation marks and citation omitted). An agency will have a comparative advantage over courts, for example, if the subject matter of the statute is especially technical or complex, or if the agency is interpreting its own regulation. *Id.* An agency's interpretation is more likely to be correct when the interpretation has gone through formal notice-and-comment rulemaking, when there are "indications of careful consideration by senior agency officials," or when the agency has maintained a consistent interpretation over time. *Id.* at 13.

During the notice-and-comment process leading up to the promulgation of the regulation implementing the Parity Act, 28 Cal. Admin. Code § 1300.74.72, the DMHC unambiguously stated that the Act requires that plans within the scope of the Act cover all "medically necessary treatments" for "severe mental illnesses." Blue Shield wrote to the DMHC during the comment period, stating that it was concerned that the Act might be interpreted to require that a plan cover all "medically necessary treatments." Blue Shield wrote:

> [W]e are concerned that the language in proposed subsection (a) [of the proposed regulation] could be construed to require the plan to provide coverage for any and all medically necessary services for [covered mental health conditions] notwithstanding that the services are not basic health services and are not otherwise covered by the enrollees benefit plan for other conditions (e.g., residential treatment, prescription drugs if not otherwise covered, etc). Therefore, we would recommend that a more direct approach be taken with respect to this provision and would offer

the following as replacement language for subsection (a):

> "The health services required to be provided by a plan for an enrollee with a severe mental illness . . . shall include all benefits and services provided to enrollees under the same subscriber contract as for other health conditions. Such coverage shall not otherwise be limited only to basic health care services within the meaning of Section 1345(b) of the Act and Section 1300.67 of Title 28."

Letter from Lyle S. Swallow, Associate General Counsel, Blue Shield of California, to Curtis Leavitt, Assistant Chief Counsel, DMHC (Sept. 25, 2002). The language suggested by Blue Shield is the functional equivalent of the language in the third prong of its proposed three-prong test, discussed above.

The DMHC responded, rejecting Blue Shield's suggested language. It wrote:

> **REJECT.** Health & Safety Code section 1374.72 requires health plans to provide mental health coverage for specified mental conditions, to the same extent as the health plan covers other medical conditions. The regulation must be read and applied so as to interpret, make specific, or clarify a statute. Given that the statute requires parity in coverage, the commentator's concern is without merit; the regulation requires only that health plans provide mental health coverage in parity with what the plan provides for other medical conditions. The draft regulation language makes clear that plans cannot limit mental health coverage to anything less than what is medically necessary and on parity with other health coverage provided by the plan.

DMHC Mental Health Parity, Responses to Comments, 1st Comment Period, 8/16 – 9/30/2002, at 1.

The DMHC's response clearly rejected Blue Shield's interpretation of the Act, but did not explicitly say that plans had to cover all medically necessary treatment for the listed mental illnesses. But the DMHC's response to other comments was very explicit. One commentator had suggested that the proposed regulation should list specific rehabilitative services that are medically necessary, and that therefore must be covered by plans within the scope of the Act. *Id.* at 18. The DMHC wrote in response:

> **REJECT.** It is not appropriate to list all services, including "rehabilitative services," that a plan must provide in order to meet the obligations of section 1374.72 [the Parity Act]. *It is sufficient that plans provide all medically necessary services. To the extent that certain rehabilitative services are medically necessary, then those services will be provided.*

*Id.* at 18 (emphasis added). Another commentator had made a similar suggestion, and the DMHC gave the same response. *See id.* at 2 ("[I]t is sufficient to state the plans must provide all medically necessary services. To the extent that certain services are medically necessary, then those services will be provided.").

However, Blue Shield contends that the DMHC has taken a contrary position on three occasions. First, Blue Shield points to *Consumer Watchdog v. California DMHC*, No. BS121397 (Super. Ct. Cal. filed June 30, 2009), in which the DMHC demurred to a complaint seeking coverage of medically necessary treatment for autism by providers not licensed in California. The DMHC described the question presented as follows:

> Petitioners allege the Department *must* order plans to cover all medically necessary ABA therapy where it

> is provided by a professional who is unlicensed in
> California. Does the law command the Department
> to order coverage in every such extreme case?

Memorandum of Points and Authorities in Support of Demurrer at 1, *Consumer Watchdog*, No. BS121397 (Super. Ct. Cal. Aug. 7, 2009). The DMHC argued that the Parity Act did not require coverage of treatment for autism when the provider was unlicensed, even if the treatment was medically necessary.

Positions taken by an agency for purposes of litigation ordinarily receive little deference under California law. *See Yahama*, 19 Cal. 4th at 23-24 (citing *Culligan Water Conditioning v. State Bd. of Equalization*, 17 Cal. 3d 86 (1976)). This is particularly so where, as here, the agency adopts a litigating position that is inconsistent with an interpretation it has previously expressed. *See Yamaha*, 19 Cal. 4th at 13. Moreover, the DMHC put forth no persuasive arguments in support of its position in the demurrer. Our skepticism about the DMHC's litigating position was shared by the Superior Court in *Consumer Watchdog*, which overruled the demurrer and held that the Act requires that plans cover medically necessary treatment by unlicensed providers "unless they have licensed providers who will provide the same services." Decision on Demurrer at 7, *Consumer Watchdog*, No. BS121397 (Super. Ct. Cal. Oct. 20, 2009).

Second, Blue Shield points to a survey conducted in 2005 by the DMHC as part of a "preliminary analysis on mental health parity." Problems identified in the survey included a lack of high-quality residential treatment centers for eating disorders, as well as "significant variation" in plan coverage of residential care for such disorders. Seven plans were studied, though the coverages of only six were described. One plan had "made a policy decision that, under parity, [residential treatment center] services are covered for all age groups and are comparable to skilled nursing home facility services."

Four plans covered residential treatment as an optional bene-
fit. One plan did not "routinely" offer residential treatment
coverage; under this plan, residential treatment coverage was
not a benefit "for most enrollees."

Blue Shield argues that if the DMHC had interpreted the
Parity Act to require residential care, it would have ordered
all seven plans to cover such care. We are not convinced that
this is so. The DMHC was conducting a survey of residential
treatment coverage as part of a larger preliminary study of
mental health parity. The study was not — and was not
designed to be — an across-the-board enforcement proceed-
ing.

Third, Blue Shield points to the May 25, 2007, letter from
DMHC Senior Counsel Andrew George to Harlick. After
reviewing a complaint from Harlick's mother Robin Watson
about Blue Shield's refusal to cover Harlick's care at Castle-
wood, George wrote:

> After reviewing all of the information submitted, we
> are unable to direct Blue Shield to cover these ser-
> vices. According to the terms of your health plan
> contract, . . . residential care is excluded from cover-
> age. As Castlewood is licensed as a residential treat-
> ment center, rather than an acute in-patient facility,
> Blue Shield is not obligated to provide coverage for
> this treatment.

Blue Shield argues that George's letter shows that the Parity
Act does not require coverage for medically necessary treat-
ment for anorexia nervosa in a residential care facility.

Blue Shield misunderstands the scope of the DMHC's
review and the purpose of George's letter. Upon request, the
DMHC will review a plan's refusal to cover care based on a
determination that the care was not medically necessary. *See*
Cal. Health & Safety Code § 1374.30(b), (d). This review is

called an "independent medical review." *Id.* Such a review deals solely with the question whether treatment was medically necessary for a particular patient. *Id.* The DMHC does not decide whether a plan should generally cover a particular treatment. *Id.*

It is clear that George's review of Harlick's complaint was an "independent medical review" under § 1374.30. Watson sent the complaint on April 9, 2007, and it was forwarded to the DMHC on April 19, 2007. On April 24, 2007, the DMHC sent Blue Shield an "Independent Medical Review Request for Health Plan Information" questionnaire. The cover sheet said, "The Department of Managed Health Care has received the attached request for an Independent Medical Review." On April 30, Blue Shield employee Carolyn Garner sent a letter to Harlick noting her "understanding that you have submitted an Application for Independent Medical Review to the California Department of Managed [H]ealth Care." On May 15, George sent a letter of inquiry to Blue Shield. The letter focused on medical necessity. It never mentioned the Parity Act. On May 23, Blue Shield employee Joan Russo wrote a letter to George explaining that the refusal to cover the treatment was based on the terms of the Plan. Her letter never mentioned the Parity Act. Once he learned that Blue Shield's refusal was a coverage decision, George sent his letter terminating the review two days later, on May 25. This letter, too, never mentioned the Parity Act. George's May 25 letter establishes only that the DMHC terminated its "independent medical review" under § 1374.30 once it determined that Blue Shield's denial was not based on a lack of medical necessity. It does not establish that the DMHC approved of Blue Shield's decision not to cover residential care at all.

### c.     Summary

**[16]** We therefore conclude that the most reasonable interpretation of the Parity Act and its implementing regulation is that plans within the scope of the Act must provide coverage

of all "medically necessary treatment" for the nine enumerated "severe mental illnesses" under the same financial terms as those applied to physical illnesses.

## C.   Medical Necessity in Harlick's Case

**[17]** The remaining question is whether Harlick's residential care at Castlewood was medically necessary. Blue Shield, as the plan administrator, normally makes the medical necessity determination in the first instance. *Sarchett v. Blue Shield of Cal.*, 43 Cal. 3d 1, 9-10 (1987). Blue Shield did not dispute that treatment at Castlewood was medically necessary until supplemental briefing filed after oral argument in this Court. Blue Shield now argues that it should be allowed to reopen its administrative process in order to determine whether Harlick's residential care was medically necessary.

An ERISA administrator who denies a claim must explain the "specific reasons for such denial" and provide a "full and fair review" of the denial. 29 U.S.C. § 1133. The administrator must also give the claimant information about the denial, including the "specific plan provisions" on which it is based and "any additional material or information necessary for the claimant to perfect the claim." 29 C.F.R. § 2560.503-1(g).

**[18]** ERISA and its implementing regulations are undermined " 'where plan administrators have available sufficient information to assert a basis for denial of benefits, but choose to hold that basis in reserve rather than communicate it to the beneficiary.' " *Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192, 1199 n.2 (9th Cir. 2010) (quoting *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 129 (1st Cir. 2004)). Claimants should not be " 'sandbagged by a rationale the plan administrator adduces only after the suit has commenced.' " *Mitchell*, 611 F.3d at 1199 n.2 (quoting *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1104 (9th Cir. 2003)) (some internal quotation marks omitted). Just as claimants

should present all of their arguments for granting the claim to the insurer during the administrative process, an insurer should tell the claimant all of its reasons for denying the claim. *Cf. Diaz v. United Agric. Employee Welfare Benefit Plan & Trust*, 50 F.3d 1478, 1483 (9th Cir. 1995).

**[19]** During the administrative process, Blue Shield never said that it was denying the claim because treatment at Castlewood was not medically necessary. Only once during its extensive communication with Harlick and Watson did Blue Shield even suggest that medical necessity might be an issue. In a letter full of other errors, one Blue Shield employee said that coverage for treatment at Castlewood was denied in part because medical necessity had not been established for a four-month period. But in a letter a few weeks later, a different Blue Shield employee reiterated that Castlewood was not covered because it was a residential facility. From that time on, Harlick was told only that Blue Shield would not pay for her care at Castlewood because her coverage did not extend to residential care. Blue Shield Senior Manager in the Law Department, Joan Russo, explained in a letter to Watson:

> The Plan is not arguing that Jeanene was not in need of care and treatment for her condition. However, it is the Plan's position that Jeanene was in a residential treatment program at Castlewood and according to the terms of her Shield Spectrum PPO Plan, residential care is not covered.

Blue Shield also told the DMHC that the denial was not based on medical necessity. During the independent medical review, George sent Blue Shield a form about the claim denial. The form began, "The health plan's reason for the denial was based on which of the following determinations: (Check the appropriate boxes) — Benefit/Coverage, Experimental/Investigational Treatment, Medical Necessity, ER/Urgent Care Reimbursement." Blue Shield checked "Benefit/Coverage," but did not check "Medical Necessity."

George terminated the "independent medical review" because that review deals only with medical necessity, and Blue Shield had not raised any issue of medical necessity.

Blue Shield has discretion to determine whether treatment is medically necessary during the administrative review process. But Blue Shield had to tell Harlick the "specific *reasons* for the denial" — not just one reason, if there was more than one — and provide a "*full* and fair review" of the denial. 29 U.S.C. § 1133 (emphases added). Blue Shield told both Harlick and her mother, as well as the DMHC, that medical necessity was not the reason for its denial of Harlick's claim. It cannot now bring out a reason that it has "held in reserve" and commence a new round of review. *See Mitchell*, 611 F.3d at 1199 n.2.

**[20]** Given that Harlick's doctors believed that outpatient treatment was insufficient, that Harlick entered Castlewood at 65% of her ideal body weight, and that Harlick needed a feeding tube while at Castlewood, it seems likely that more than outpatient treatment was indeed necessary. But we need not decide that question. By failing to assert during the administrative process that medical necessity was a reason for denying Harlick's claim, Blue Shield forfeited the ability to assert that defense in the litigation now before us.

## Conclusion

**[21]** Harlick's Plan does not itself require that Blue Shield pay for residential care at Castlewood for her anorexia nervosa. However, California's Mental Health Parity Act provides that Blue Shield "shall provide coverage for the diagnosis and medically necessary treatment" of "severe mental illnesses," including anorexia nervosa. Blue Shield is foreclosed from asserting that Harlick's residential care at Castlewood was not medically necessary. We therefore conclude that Blue Shield is obligated under the Parity Act to pay for Harlick's residential care at Castlewood, subject to the

same financial terms and conditions it imposes on coverage for physical illnesses.

**REVERSED.**