FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARTHA GARCIA,
*Plaintiff-Appellant*,

v.

PACIFICARE OF CALIFORNIA, INC.;
UHC OF CALIFORNIA, DBA
UnitedHealthcare of California,
*Defendants-Appellees*.

No. 13-55468

D.C. No.
8:12-cv-02022-
JVS-RNB

OPINION

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted
October 7, 2013—Pasadena, California

Filed May 8, 2014

Before: Stephen Reinhardt, Andrew J. Kleinfeld,
and Morgan Christen, Circuit Judges.

Opinion by Judge Christen

## SUMMARY[*]

### Health Insurance

Affirming the district court's summary judgment in an action under the Employment Retirement Income Security Act, the panel held that an insurance company's categorical exclusion of myoelectric prosthetics from a health insurance plan did not violate California Health & Safety Code § 1367.18.

### COUNSEL

Jeffrey Isaac Ehrlich (argued), The Ehrlich Law Firm, Encino, California, for Plaintiff-Appellant.

Ethan P. Schulman (argued), Crowell & Moring, LLP, San Francisco, California; Jennifer S. Romano, Crowell & Moring, LLP, Los Angeles, California, for Defendants-Appellees.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## OPINION

CHRISTEN, Circuit Judge:

This case involves a single issue: does an insurance company's categorical exclusion of myoelectric prosthetics from a health insurance plan violate California Health & Safety Code § 1367.18?  We have jurisdiction under 28 U.S.C. § 1291 and hold that such an exclusion does not violate this statute.

## I.  BACKGROUND

In 1989, eleven-year-old Martha Garcia ("Garcia") contracted spinal meningitis, which necessitated the amputation of her hands at the wrists and her legs below the knees.  From 1990 to 1996 she used body-powered/cable and harness upper-extremity prostheses.  When she was a senior in high school she was fitted for myoelectric upper-extremity prostheses.[1]  The myoelectric prostheses "allowed [her] to live independently, obtain a college degree, and to work full time."

Since 2006, Garcia has worked for the Regional Center of Orange County ("Regional Center").  When she began work at the Regional Center, she was included on her father's Blue Cross health insurance policy that covered myoelectric

---

[1] A myoelectric prosthesis "uses electromyography signals or potentials from voluntarily contracted muscles within a person's residual limb via the surface of the skin to control the movements of the prosthesis, such as . . . wrist supination/pronation or hand opening/closing of the fingers."  In contrast, the more common "body-powered prosthesis" has "a hook at the end of the arm that the wearer operates by moving the muscles of the residual limb."

prostheses.     The Regional Center provided health care coverage through PacifiCare,[2] which she selected because it allowed her to receive treatment from the same doctors and prosthetic specialists she had been seeing under her father's Blue Cross policy.

In 2009, Garcia's myoelectric prostheses began to fail, so her physician submitted a replacement request to Memorial Healthcare ("Memorial"), the independent practice association under contract with PacifiCare for Regional Center employees.  Memorial denied the physician's request because "myoelectronic prosthetics are not a benefit covered under [Garcia's] health plan."  Garcia appealed the decision to PacifiCare, which upheld the denial of coverage "on the basis of a specific benefit exclusion" per Garcia's Evidence of Coverage document, which states that "myoelectric . . . prosthetics are not covered."  PacifiCare does not dispute that Garcia's physician-prescribed myoelectric devices are medically necessary.

In January 2010, Garcia filed a grievance with the California Department of Managed Health Care ("DMHC"). DMHC determined that it "did not find a violation of the California health plan law regarding this issue."  In November 2012, Garcia brought this action in the Central District of California under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(3), alleging that PacifiCare's benefit exclusion was contrary to California Health & Safety Code § 1367.18.[3]  In

---

[2] PacifiCare subsequently changed its name to UnitedHealthcare.

[3] PacifiCare does not dispute that Garcia's plan is an ERISA plan.

March 2013, the district court granted summary judgment for PacifiCare.

## II.  STANDARD OF REVIEW

We review de novo a district court's order granting summary judgment and its interpretation of state law.  *Nolan v. Heald College*, 551 F.3d 1148, 1153 (9th Cir. 2009); *Matter of McLinn*, 739 F.2d 1395, 1397 (9th Cir. 1984) (en banc).

## III.    DISCUSSION

### A.  Statutory Text

California Health & Safety Code § 1367.18 was enacted in 1985 and amended in 1991 and 2006.[4]  The original statute read:

> Every health care service plan, except a specialized health care service plan, that covers hospital, medical, or surgical expenses on a group basis shall offer coverage for orthotic and prosthetic devices and services under the terms and conditions that may be agreed upon between the group subscriber and the plan.  Every plan shall communicate the availability of that coverage to all group contractholders and to all prospective group contractholders with whom they are negotiating.

[4] Section 1367.18 is a provision of the Knox-Keene Health Care Service Plan Act.  Cal. Health & Safety Code §§ 1340–1399.835.

In 1991, the following language was added:

> Any coverage for prosthetic devices shall include original and replacement devices, as prescribed by a physician. Any coverage for orthotic devices shall provide for coverage when the device, including original and replacement devices, is prescribed by a physician, or is ordered by a licensed health care provider acting within the scope of his or her license. Every plan shall have the right to conduct a utilization review to determine medical necessity prior to authorizing these services.

In 2006, the statute was again amended, with the existing language being designated as subpart (a) and the following language being designated as subpart (b):[5]

> Notwithstanding subdivision (a), on and after July 1, 2007, the amount of the benefit for orthotic and prosthetic devices and services shall be no less than the annual and lifetime benefit maximums applicable to the basic health care services required to be provided under Section 1367. If the contract does not include any annual or lifetime benefit maximums applicable to basic health care services, the amount of the benefit for orthotic and prosthetic devices and services shall not

---

[5] The amendment also added language to part (a) allowing surgeons and podiatrists to prescribe prosthetics and orthotics. That language is not relevant here.

be subject to an annual or lifetime maximum benefit level. Any copayment, coinsurance, deductible, and maximum out-of-pocket amount applied to the benefit for orthotic and prosthetic devices and services shall be no more than the most common amounts applied to the basic health care services required to be provided under Section 1367.

## B. Application

PacifiCare denied Garcia's claim based solely on an express exclusion in its policy; it did not contest the medical necessity of myoelectric prosthetic devices for Garcia's medical condition. Garcia agrees the plan expressly excludes coverage for myoelectric prosthetic devices, but she argues that § 1367.18(a) requires plans to cover any prosthetic device if it is medically necessary and prescribed by a physician.

In answering a question of California law, this court "predict[s] how the highest [California] court would decide the issue." *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1126 (9th Cir. 2005) (internal quotation marks and citations omitted). The question presented here is one of pure statutory interpretation, so this court "look[s] to California principles of statutory construction." *Id*. When interpreting a statutory provision, California courts look first to the text of the statute, "giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose." *State Farm Mut. Auto. Ins. Co. v. Garamendi*, 88 P.3d 71, 78 (Cal. 2004) (internal quotation marks and citations omitted). Language that permits "more

than one reasonable interpretation allows [courts] to consider other aids, such as the statute's purpose, legislative history, and public policy." *Cortez v. Abich*, 246 P.3d 603, 607 (Cal. 2011) (internal quotation marks and citation omitted).

The parties agree that, as enacted in 1985, the original version of the statute only required plans to *offer coverage* for prosthetic devices; the statute afforded complete discretion to the plans to negotiate the "terms and conditions" of prosthetics coverage.[6] Thus, if the 1985 version of the statute were still in effect, there would be no question about the correctness of PacifiCare's position: plans would be obliged to offer coverage for prosthetic devices, but the *type* of prosthetic devices offered would be negotiable as a "term or condition" to be agreed upon by the parties.

Section 1367.18 has been amended twice since it was adopted, and those amendments are the focus of the parties' briefing. The 2006 amendment limited the ability of plans to cap the amount of benefits for prosthetic devices; it did not address the *scope* of coverage, i.e., the type or types of devices that plans must offer, or cover. Accordingly, the 2006 amendment is not dispositive of Garcia's argument, which hinges instead on the extent to which the 1991 amendment changed the plan's discretion to negotiate the types of prosthetics it will cover as a "term and condition" of coverage.

---

[6] Garcia's brief concedes: "Initially, the statute simply required HMOs to offer prosthetics coverage to group subscribers (i.e. employers), under terms and conditions that the plan and employer agreed upon. The original version of the statute therefore afforded plans complete discretion about the contents of the prosthetics coverage they offered."

PacifiCare argues that § 1367.18 has always required—and continues to require—that prosthetic coverage must be *offered* on terms and conditions mutually agreed upon, and that the 1991 amendment only requires that whatever coverage is offered must extend to both original and replacement devices. Garcia views the 1991 amendment much more expansively. She argues that the 1991 amendment transformed the statute from a "mandate to offer" into a "mandate to cover."[7] Far from the unfettered discretion permitted by the original "terms and conditions" language, Garcia's reading of the 1991 amendment prevents plans from adopting "terms and conditions" that defeat what she interprets to be the California legislature's 1991 decision to mandate that medically necessary prosthetics, prescribed by physicians, must be *covered*. Specifically, Garcia argues that the 1991 amendment requires the provision of all original and replacement prosthetic devices prescribed by a physician that are "medically necessary."

There is some basis for both interpretations of the statute, but for several reasons we ultimately agree with PacifiCare. To begin, Garcia's interpretation of the 1991 amendment requires coverage for all prosthetic devices prescribed by a physician (subject to a review for necessity), and, as

---

[7] *Yeager v. Blue Cross of California*, 96 Cal. Rptr. 3d 723, 727–28 (Cal. Ct. App. 2009), describes the difference between mandate to offer and mandate to cover statutes. The difference is illustrated by comparing § 1367.18 ("Every . . . plan . . . *shall offer* coverage for orthotic and prosthetic devices and services under terms and conditions *that may be agreed upon* between the group subscriber and the plan") with § 1374.72 ("Every . . . plan . . . *shall provide* coverage for the diagnosis and medically necessary treatment of severe mental illnesses . . . *under the same terms and conditions* as specified in subdivision (c)") (emphases added).

PacifiCare notes, the 1991 amendment does not include the word "all." *See Yeager*, 96 Cal. Rptr. 3d at 727 ("We may not make a silent statute speak by inserting language the Legislature did not put in the legislation."). Building on the admittedly untethered discretion the 1985 statute allowed for negotiating "terms and conditions" of coverage to be offered, the 1991 amendment merely states that "[a]ny coverage for prosthetic devices shall include original and replacement devices, as prescribed by a physician," subject to a utilization review to determine medical necessity. Garcia's concession that the original 1985 statutory language allowed plans to define the scope of coverage they would offer—that is, the *type* of prosthetic devices they would cover—among the "terms and conditions" to be agreed upon by the parties, seriously undermines her interpretation of the 1991 amendment.

The 1991 amendment must be viewed in the context of the original statute because the legislature did not replace the 1985 language; it retained the original statutory language and added a new provision to it. For this reason, the parties' agreement that the original statute only required plans to *offer* coverage for prosthetics on mutually agreeable terms—an interpretation with which we agree—informs the meaning to be given to the amendment. Read in conjunction with the original 1985 language, the 1991 amendment only requires that, whatever type or types of prosthetic devices a plan offers to cover, the coverage must extend to original and replacement devices. The 1991 amendment requiring that plans covering a particular type of prosthetic device must cover original and replacement devices of the same type, as long as they are prescribed and deemed medically necessary, cannot be equated to a mandate that a particular type of device must be covered if it is prescribed and medically

necessary. The plain terms of the 1991 amendment do not prohibit a plan from limiting the scope of coverage as a negotiable term or condition of the plan, except that, after the 1991 amendment, plans are clearly prohibited from adopting "terms and conditions" that exclude replacement devices.

A second problem with Garcia's interpretation is that § 1367.18(a) retains language stating that plans "shall offer coverage" for prosthetic devices under terms and conditions that may be agreed upon by the group subscriber and the plan. If the legislature intended the 1991 amendment to transform the statute from a "mandate to offer" into a "mandate to cover," as Garcia suggests, we can see no reason for retaining the original "mandate to offer" language from the 1985 version of the statute. The legislature's decision to retain the requirement that plans "shall offer coverage" subject to mutually agreeable terms and conditions is consistent with PacifiCare's view that the 1991 amendment is limited to requiring that, whatever prosthetics coverage is offered by a plan, it must include original and replacement devices.

Garcia argues that her interpretation of the statute is supported by *Harlick v. Blue Shield of California*, 686 F.3d 699 (9th Cir. 2012), but we do not find support for her position there. *Harlick* involved the denial of a claim for residential treatment for anorexia nervosa. After concluding that the plan excluded this type of care, our court considered whether California's Mental Health Parity Act nevertheless requires that plans within the scope of the Act must provide all "medically necessary treatment" for "severe mental illnesses." We concluded that it does. The Parity Act was enacted to require plans that provide hospital, medical, or surgical coverage to also provide coverage for the diagnosis and treatment of severe mental illnesses under the same terms

and conditions applied to other medical conditions. *Id.* at 710–11. As summarized in *Harlick*, the pertinent part of the Parity Act specifies that plans within its scope "*shall provide coverage for* . . . medically necessary treatment of severe mental illnesses," including anorexia nervosa. *Id*. at 711. Our court explained that the statute contains "only one limitation *on the basic mandate that coverage be provided* for 'medically necessary treatment of severe mental illnesses': such coverage must be provided 'under the same terms and conditions applied to other medical conditions as specified in subdivision (c)'" of the statute. *Id*. (emphasis added). The parties in *Harlick* agreed that the phrase "terms and conditions" in the Parity Act refers to monetary conditions, such as copayments and deductibles. *Id*. Thus, given the language and structure of the Parity Act, our court ruled that plans within its scope are required to cover all medically necessary treatment for severe mental illnesses, including anorexia nervosa, and that plans are permitted to apply the same financial conditions—such as deductibles and lifetime benefits—that they apply to coverage for physical illnesses. *Id.* at 712.

Garcia argues that *Harlick* supports her position because the Parity Act was deemed to require coverage for all medically necessary treatment, even though the Parity Act does not include the word "all." But Garcia overlooks that the Parity Act mandates coverage, not just offers to cover. She also overlooks our court's observation that the only limitation on the Parity Act's basic mandate for coverage is that it be offered on the same monetary conditions that apply to other types of coverage. *Id*. at 711.

Finally, Garcia overlooks our court's observation in *Harlick* that the Knox–Keene Act and the Parity Act "operate

in fundamentally different ways." *Id.* at 716. "Because the Parity Act applies to severe mental illnesses, some of which are life threatening, it makes sense that the Act requires insurers to cover all medically necessary treatments. It makes equal sense that the Knox–Keene Act, which applies to the full range of physical illnesses, does not require insurers to cover all medically necessary treatments." *Id.* We do not doubt that the most advanced prosthetics are capable of greatly improving a user's quality of life, but they cost more than other options. The California legislature knows how to mandate insurance coverage when it chooses. *See Yeager*, 96 Cal. Rptr. 3d at 727. Consistent with the distinction explained in *Harlick*, in § 1367.18 the legislature left the choice between lower costs and better prosthetics to the plan and its subscriber.

Though the district court found § 1367.18 to be unambiguous, it considered some of the pertinent legislative history and found that it supported PacifiCare's interpretation of the statute. We agree. The statute's original sponsor, Assemblyman Bill Filante, M.D., also offered the 1991 amendment. He made clear that the 1991 amendment was intended to require coverage for replacement devices. In his floor remarks introducing the bill and in a letter to the governor, he wrote:

> Approximately 7 years ago I introduced legislation which required insurers to *offer optional coverage* for orthotic and prosthetic devices. Subsequently, many insurers have included this coverage *as an option*. Unfortunately, some insurers have begun to unfairly limit this coverage to only one device per policy. This bill would allow these

devices *to be replaced* when medically necessary.

(Emphasis added).  A Senate Rules Committee analysis of the 1991 amendment described it similarly: "This bill requires health care service plans . . . to also include original and replacement devices when prescribed by a physician. . . . Current law requires health care service plans . . . to offer coverage for orthotic and prosthetic devices and services under mutually agreed terms and conditions. . . . Many times, coverage is limited to one device."  Other legislative history, such as a report prepared for the Assembly Committee on Insurance and a report prepared for the Assembly's third reading of the bill, also supports this view of the amendment's purpose.

Garcia argues that the district court's interpretation of the statute defeats the legislative purpose by excluding myoelectric devices through the "terms and conditions" clause.  But as previously explained, the legislature did not express an intent to mandate coverage.  Further, though this case does not require that we define the limits of how a policy could fairly be restricted by the inclusion of restrictions within its "terms and conditions," PacifiCare's counsel conceded at oral argument that restrictive "terms and conditions" would have to be reasonable, and from this we understand that, at a minimum, there is no dispute that such terms could not permissibly render coverage illusory.  The record before us does not support a finding that the prosthetic coverage offered by PacifiCare was unreasonably restricted.

Because we agree with PacifiCare's interpretation of the plain language of § 1367.18, we need not reach PacifiCare's

argument that we should defer to the DHMC's interpretation of the statute.

## IV.     CONCLUSION

For the forgoing reasons, we **AFFIRM** the district court's order granting summary judgment for PacifiCare.  We also **DENY AS MOOT** Garcia's motion to certify to the California Supreme Court the question whether California Health & Safety Code § 1367.18 requires PacifiCare to cover Garcia's myoelectric prostheses.