**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JEANENE HARLICK,
        *Plaintiff-Appellant,*

v.

BLUE SHIELD OF CALIFORNIA,
        *Defendant-Appellee.*

No. 10-15595

D.C. No.
3:08-cv-03651-SC

ORDER AND
OPINION

Appeal from the United States District Court
for the Northern District of California
Samuel Conti, Senior District Judge, Presiding

Argued and Submitted
May 11, 2011—San Francisco, California

Filed June 4, 2012

Before: William A. Fletcher and N. Randy Smith,
Circuit Judges, and Richard Mills, Senior District Judge.*

Opinion by Judge William A. Fletcher;
Partial Concurrence and Partial Dissent by
Judge N.R. Smith

---

*The Honorable Richard Mills, Senior District Judge for the U.S. District Court for Central Illinois, Springfield, sitting by designation.

## COUNSEL

Lisa S. Kantor, Elizabeth K. Green, KANTOR & KANTOR, Northridge, California, for the plaintiff-appellant.

Adam Pines, Joanna Sobol McCallum, MANATT, PHELPS & PHILLIPS, LLP, Los Angeles, California, for the defendant-appellee.

Ethan P. Schulman, CROWELL & MORING LLP, San Francisco, California, for amicus curiae California Association of Health Plans.

John M. LeBlanc, BARGER & WOLEN LLP, Los Angeles, California, for amicus curiae California Chamber of Commerce.

Henry W. Crowle, CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM LEGAL OFFICE, Sacramento, California, for amicus curiae California Public Employees' Retirement System.

Adam Michael Cole, CALIFORNIA DEPARTMENT OF INSURANCE, San Francisco, California, for amicus curiae Insurance Commissioner for the State of California Dave Jones.

---

## ORDER

This court's opinion filed on August 26, 2011, and published at *Harlick v. Blue Shield of California*, 656 F.3d 832 (9th Cir. 2001), is withdrawn and replaced by the attached Opinion and Dissent.

With the filing of this new opinion and dissent, Judge Fletcher and Judge Mills voted to deny the petition for panel rehearing. Judge Fletcher voted to deny the petition for rehearing en banc, and Judge Mills so recommended. Judge Smith voted to grant the petition for panel rehearing and the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc, filed September 9, 2011, are **DENIED**.

Subsequent petitions for panel rehearing and/or petitions for rehearing en banc may be filed with respect to the Opinion in accordance with the requirements of Fed. R. App. P. 40 and 35.

**OPINION**

W. FLETCHER, Circuit Judge:

Plaintiff Jeanene Harlick suffers from anorexia nervosa. The question before us is whether Blue Shield was required to pay for her care at a residential treatment facility, either under the terms of her insurance plan or under California's Mental Health Parity Act. We conclude that her insurance plan, considered alone, does not so require, but that the Mental Health Parity Act does so require.

## I.    Background

### A.    Harlick's Treatment at Castlewood

Jeanene Harlick, who is 38 years old, has suffered from anorexia for more than twenty years. In early 2006, when she was a clerk at the Pacific Construction & Manufacturing Company, she relapsed and began intensive outpatient treatment. At that time, she was enrolled in the company's health insurance plan through Blue Shield ("the Plan"), which paid for the treatment.

In March 2006, Harlick's doctors told her that she needed a higher level of care than the intensive outpatient treatment then being provided. Blue Shield employees told Harlick on the telephone that residential treatment was not covered under her Plan, but that partial or inpatient (full-time) hospitalization would be covered if Blue Shield determined that it was medically necessary. Blue Shield employees gave Harlick the names of several facilities where such treatment might be covered. Harlick and her doctors ultimately determined that none of the in-network facilities suggested by Blue Shield could provide effective treatment, so she registered at Castlewood Treatment Center, a residential treatment facility in Missouri that specializes in eating disorders. When Harlick entered Castlewood, she was at 65% of her ideal body weight.

When she had been there less than a month, a feeding tube was inserted because her "caloric level needed to gain weight was so high." Harlick stayed at Castlewood from April 17, 2006 to January 31, 2007.

According to Castlewood's website, it is a "Residential Treatment Facility and Day Hospital program for individuals needing comprehensive treatment for anorexia nervosa, bulimia nervosa, and binge eating disorders." Castlewood specializes in the treatment of those who, like Harlick, have multiple mental illnesses and have failed in other treatment programs. Six levels of care are available at Castlewood. In increasing order of intensity, they are a community support group, an outpatient program, an intensive outpatient program, day treatment, "Step Down" or partial hospitalization, and residential care. Every week, patients in residential care have four sessions with an individual therapist, one session with a psychiatrist, one session with a nutritionist, and many hours of group therapy. Castlewood staff members are on-site twenty-four hours a day. They plan patients' meals, monitor patients' food intake and kitchen use, provide dietary supplements, and maintain feeding tubes. Several staff members at Castlewood have graduate degrees in psychology, but none of the staff members is a medical doctor or a nurse.

Castlewood is consistently described as a "residential" community on its website. In an FAQ section of the website discussing insurance, potential patients are told to ask their insurance companies about available benefits for "[r]esidential, mental health, non-substance abuse" treatment. The website says that "Castlewood . . . is licensed as a 'Residential' facility, so it is important to obtain the residential benefit and not simply the 'inpatient' benefit, as they might be different." The website also says that many states "have 'parity' laws, which means that the eating disorder could potentially be covered on par with medical benefits."

## B.   The Plan

For mental illnesses, Harlick's insurance plan covers inpatient services, limited outpatient services, office visits, psychological testing, and in-person or telephone counseling sessions. Inpatient services are covered "in connection with hospitalization or psychiatric Partial Hospitalization (day treatment)." Inpatient services for treatment of mental illnesses are discussed three times in the Plan. Each time, the Plan says that "[r]esidential care is not covered." "Residential care" is not defined anywhere in the Plan.

For physical illnesses, the Plan covers extensive hospital treatment, outpatient treatments, and office visits. It also covers certain forms of "subacute care." Subacute care is defined as "skilled nursing or skilled rehabilitation provided in a Hospital or Skilled Nursing Facility to patients who require skilled care such as nursing services, physical, occupational or speech therapy, a coordinated program of multiple therapies or who have medical needs that require daily Registered Nurse monitoring." A Skilled Nursing Facility ("SNF") is defined as "a facility with a valid license issued by the California Department of Health Services as a Skilled Nursing Facility or any similar institution licensed under the laws of any other state, territory, or foreign country." The Plan provides coverage for up to 100 days at an SNF.

## C.   Blue Shield's Coverage Decision

Blue Shield paid for the first eleven days of Harlick's treatment at Castlewood, but then refused to pay for the rest of her treatment. Blue Shield conducted several internal reviews of Harlick's claim, and Blue Shield employees engaged in extensive correspondence with Harlick and her mother, Robin Watson, about her claim.

On September 20, 2006, Blue Shield employee Bruce Berg reviewed Harlick's record and recommended denying the

claim in an internal document that was not sent to Harlick or Watson. Berg wrote, "[T]his appears to be residential care as stated in the consent to treatment/treatment plan. . . . Residential treatment is not a benefit."

On December 8, 2006, Blue Shield employee David Battin reviewed the claim in another internal document. Battin concluded that "[t]he principal reason" for the denial was that Harlick's plan did not cover residential care. A few days later, on December 12, 2006, Blue Shield employee Risell Tachin-Salazar wrote to Harlick and denied the claim based on Battin's review, explaining that Harlick did not have a benefit for residential care.

On January 19, 2007, Blue Shield employee Carroll Cederberg reviewed the claim in another internal document. Cederberg again concluded that residential care was not a covered benefit under Harlick's Plan.

On March 27, 2007, David Battin reviewed the claim again in another internal document. He concluded:

> The principal reason [for the denial] is that these services are not a covered benefit. As per your health plan's Evidence of Coverage (EOC); all inpatient psychiatric hospital care must be prior authorized by the Mental Health Services Administrator (MHSA), except for emergency care. Since you specifically traveled to Missouri to be admitted to this particular facility, this would not be considered as an emergency admission. You also had amble [sic] time to contact MHSA for authorization prior to your admission. In addition; [sic] residential care (room and board) is not a covered benefit. During the dates of service 4/28/06 to 8/25/06 the medical necessity of being treated as an inpatient was not established, you could have been treated as an outpatient. Since your EOC does not cover room and board, the facility fees

for your residential treatment . . . are not a covered benefit.

Battin also wrote that professional fees incurred at Castlewood, such as psychologists' fees, would be covered if Blue Shield found that the professional treatment was medically necessary. A few days later, on April 6, 2007, Blue Shield employee Mary Anne Gomez sent a letter to Harlick that repeated Battin's statements nearly verbatim.

On April 30, 2007, Blue Shield employee Carolyn Garner wrote to Harlick, reiterating that coverage for treatment at Castlewood had been denied because Harlick's plan did not cover residential treatment. Garner corrected two errors in Gomez's April 6 letter. First, she explained that the preauthorization requirement did not apply to facilities outside California. Second, she explained that professional fees incurred at Castlewood would not be covered unless the professionals billed Blue Shield independently. Since Castlewood charged a global fee that included professional fees, Blue Shield would not cover those fees. Finally, in response to an inquiry from Harlick's mother, Robin Watson, Garner wrote that California's mental heath parity law did not require Blue Shield to cover treatment at Castlewood. Garner wrote that the Plan did not cover any residential treatment, "whether the diagnosis is for a mental health condition or a medical condition," so there was no violation of the parity law.

On May 2, 2007, according to Watson, Blue Shield employee Mary Anne Gomez suggested to Watson on the telephone that Blue Shield might, in fact, cover professional fees from Castlewood, and told her to separate her claims for professional fees from her claims for room and board.

On August 3, 2007, Blue Shield employee Joan Russo wrote a detailed letter to Watson clarifying inconsistencies in previous letters and reiterating reasons for the denial. She repeated that the claim had been denied because residential

facilities were not covered. She explained, for the first time, that Blue Shield had paid for the first eleven days at Castlewood because of a "coding error." According to Russo, the coder used "a procedure code that did not identify the claim as a mental health diagnosis," so it was paid automatically. Finally, Russo said that professional fees would not be covered. The letter stated that it was the final decision in Harlick's administrative appeal.

Blue Shield eventually paid for professional fees incurred at Castlewood. It has never paid for the rest of her treatment at Castlewood.

### D.   DMHC Review

Frustrated by Blue Shield's refusal to pay, Watson filed a complaint with California's Insurance Commissioner. Her letter was forwarded to the California Department of Managed Health Care, where Senior Counsel Andrew George investigated the complaint. George wrote to Blue Shield and asked, among other things: (1) why Harlick had been told that residential care was not medically necessary; (2) why Harlick was told that benefits would be denied because care was not pre-authorized, even though the Plan clearly stated that lack of preauthorization resulted only in a $250 penalty; and (3) whether Castlewood could be covered as an SNF. After talking to Russo at Blue Shield, George concluded that "although [Harlick] ha[d] been provided with conflicting information from the Plan regarding its basis for denial," Blue Shield had denied coverage because Harlick's Plan did not cover residential care.

### E.   Proceedings in the District Court

On October 31, 2008, Harlick filed a complaint in federal district court. On March 4, 2010, the district court granted Blue Shield's motion for summary judgment and denied Harlick's motion for summary judgment. The court found that

Harlick's Plan unambiguously excluded coverage for residential care and that, while the Plan did cover care at Skilled Nursing Facilities, Castlewood was not an SNF. The court did not reach the question whether California's Mental Health Parity Act required coverage of Harlick's residential treatment at Castlewood.

## II.   Standard of Review

We review *de novo* the district court's decision on coverage provided by an ERISA plan. *Nolan v. Heald Coll.*, 551 F.3d 1148, 1153 (9th Cir. 2009) Like the district court, we review the plan administrator's decision whether to grant benefits for abuse of discretion. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 959 (9th Cir. 2006) (en banc). In the ERISA context, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Nolan,* 551 F.3d at 1154 (internal quotation marks and citation omitted).

## III.   Discussion

### A.   Plan Coverage of Residential Care

For the reasons that follow, we conclude that Harlick's Plan, considered alone, does not provide coverage for her residential care at Castlewood.

#### 1. Review for Abuse of Discretion

**[1]** When we review an ERISA plan administrator's denial of benefits, the standard of review depends on whether the plan explicitly grants the administrator discretion to interpret the plan's terms. *Abatie*, 458 F.3d at 967. The parties agree that Harlick's plan did grant Blue Shield such discretion. We therefore review Blue Shield's decision for abuse of discretion. *Id.* However, our review is "tempered by skepticism"

when the plan administrator has a conflict of interest in deciding whether to grant or deny benefits. *Id.* at 959, 968-69. In such cases, the conflict is a "factor" in the abuse of discretion review. *Abatie*, 458 F.3d at 966-68; *accord Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). The weight of that factor depends on the severity of the conflict. *Abatie*, 458 F.3d at 968; *Glenn*, 554 U.S. at 108, 115-117.

**[2]** A conflict arises most frequently where, as here, the same entity makes the coverage decisions and pays for the benefits. This dual role always creates a conflict of interest, *Glenn*, 554 U.S. at 108, but the conflict is "more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision." *Id.* at 117. The conflict is less important when the administrator takes "active steps to reduce potential bias and to promote accuracy," *id.*, such as employing a "neutral, independent review process," or segregating employees who make coverage decisions from those who deal with the company's finances. *Abatie*, 458 F.3d at 969 n.7. The conflict is given more weight if there is a "history of biased claims administration." *Glenn*, 554 U.S. at 117. Our review of the administrator's decision is also tempered by skepticism if the administrator gave inconsistent reasons for a denial, failed to provide full review of a claim, or failed to follow proper procedures in denying the claim. *See Lang v. Long-Term Disability Plan*, 125 F.3d 794, 798-99 (9th Cir. 1997); *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110 (9th Cir. 1999).

Harlick points to four factors that she argues should result in our review of Blue Shield's decision being tempered by skepticism: (1) Blue Shield both makes coverage decisions and pays benefits; (2) Blue Shield gave inconsistent reasons for its denial of Harlick's claim; (3) Blue Shield "never explained why the California Mental Health Parity Act did not require payment of [the] claim"; and (4) Blue Shield excluded "residential treatment" from the Plan's coverage without defining the term. We take these factors in turn.

First, Blue Shield concedes that as plan administrator it both makes coverage decisions and pays benefits. However, the record before us does not indicate whether Blue Shield has a history of bias in claims administration or whether it has taken any steps to promote accurate decisionmaking. *See Glenn*, 554 U.S. at 117; *Abatie*, 458 F.3d at 969 n.7.

Second, Blue Shield also concedes that it gave Harlick inconsistent information about why it would not pay for her treatment at Castlewood. But Blue Shield argues that its mistakes were minor and quickly corrected. We disagree with Blue Shield's characterization of its mistakes. At the beginning of the process, Watson spoke several times to Blue Shield's call center employees. According to Watson, they gave her no useful information about whether treatment at Castlewood would be covered. When Harlick entered Castlewood, Blue Shield paid without complaint for eleven days, and then abruptly stopped paying. It took more than a year for Blue Shield to explain that it had paid for the first eleven days because of a "coding error." Harlick and Watson received four letters from four different Blue Shield representatives explaining why treatment at Castlewood was not covered. The first letter said that residential treatment was not covered. The second letter said that residential treatment was not covered, that treatment was not preauthorized, and that treatment was not medically necessary, but that professional fees might be covered. The third letter said that residential treatment and professional fees were not covered. An employee then told Watson on the telephone that professional fees might be covered. The fourth letter said that residential treatment was not covered and professional fees were not covered. Blue Shield eventually paid the professional fees. While there is no evidence indicating that Blue Shield changed its explanations in bad faith, or suggesting that Blue Shield was determined to deny Harlick's claim regardless of its validity, the combined effect of its communications to Harlick and Watson was confusing and frustrating.

Third, Harlick argues that Blue Shield failed to explain why the Mental Health Parity Act did not mandate coverage. This argument is contradicted by the record. Carolyn Garner explained in her April 30 letter why Blue Shield believed that the Act did not mandate coverage.

Fourth, it is true that Blue Shield denied coverage for "residential care" without ever defining the term. As discussed below, however, we discern no real ambiguity in the meaning of "residential care" in Harlick's Plan, and there is no indication that Blue Shield exploited any uncertainty about the meaning of "residential care." *Compare Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1162 & n.33 (9th Cir. 2001) (an employer may not exploit uncertainty that it has created).

**[3]** The net effect is that our review of Blue Shield's denial of coverage is for abuse of discretion, but tempered by some skepticism because of Blue Shield's structural conflict and its changing explanations for denying coverage.

### 2.    Coverage Under the Plan

Harlick makes two arguments in support of her contention that the Plan covers her treatment at Castlewood. First, she argues that the Plan covers residential care. Second, she argues, in the alternative, that her care at Castlewood qualifies for coverage as care at a Skilled Nursing Facility. We find both arguments unpersuasive.

### a.    Residential Care

An ERISA plan is a contract that we interpret "in an ordinary and popular sense as would a [person] of average intelligence and experience." *Gillam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007) (internal quotation marks and citation omitted). We look first to the "explicit language of the agreement to determine, if possible, the clear intent of the par-

ties," and then to extrinsic evidence. *Id.* (internal quotation marks and citation omitted). Harlick argues that the term "residential care" in the Plan is ambiguous for two reasons. First, she argues that "residential care" has no defined meaning in the Plan. Second, she argues that the exclusion of residential care is unclear because of its placement in the Plan. Specifically, she points out that the exclusion of "residential care" occurs in the sections of the Plan that deal with inpatient hospital care, suggesting that Blue Shield intended to exclude coverage for residential care only in the context of hospitals.

**[4]** Harlick's own evidence shows, however, that "residential care" has a fairly well-established meaning in the context of the treatment of mental illness, particularly eating disorders. Castlewood's website calls Castlewood a "residential treatment facility." An FAQ on Castlewood's website explains that Castlewood "is licensed as a 'Residential' facility, so it is important to obtain the residential benefit." Harlick argues in her opening brief that "residential treatment center" is one of "five critical levels of care which should be considered for patients with an eating disorder," and she quotes several professional associations opining on the importance of residential care for eating disorders. A survey done by the California Department of Managed Health Care, discussed below, specifically addresses coverage for residential care for eating disorders. There may be disputes at the margin about what qualifies as residential care, and it is certainly preferable for a plan to define key terms. But there is no evidence of actual confusion in this case about whether treatment at Castlewood was "residential care."

We also disagree that the placement of the exclusion was confusing. Every time the Plan says anything about inpatient care for mental illness, it specifies that residential care is not a covered benefit. The Plan states three times that residential care is not covered. First, it states that "inpatient services" are covered when they are connected with hospitalization, but that "[r]esidential care is not covered." Second, it states that

"[r]esidential care is not covered" in the section describing payment responsibilities for inpatient professional and physician services. Third, it states that "[r]esidential care is not covered" in the section describing payment responsibilities for inpatient hospital treatment.

**[5]** Blue Shield could have organized the Plan more clearly — for example, it could have put an exclusion for residential care in the "Principal Limitations" section — but the organization is neither illogical nor misleading. Residential care is a type of inpatient care. A Plan subscriber wanting to know whether residential care is covered would go to the sections of the Plan describing coverage for inpatient care, and would discover, each time inpatient care is mentioned, a statement that residential care is not covered. Since the entire section of the Plan dealing with treatment of mental illness is only six pages long, these statements are not difficult to find. We believe that a person "of average intelligence and experience" would have no trouble concluding that the Plan does not cover residential care. *Compare Saltarelli v. Bob Baker Group Med. Trust*, 35 F.3d 382, 385-87 (9th Cir. 1994) (holding that placement of exclusion was so inexplicable that exclusion was unenforceable).

### b.    Skilled Nursing Facility

**[6]** Harlick argues, in the alternative, that Castlewood is a Skilled Nursing Facility under the Plan. Harlick's Plan covers a maximum of 100 days of treatment each year at an SNF. A "Skilled Nursing Facility" is defined in the Plan as "a facility with a valid license issued by the California Department of Health Services as a Skilled Nursing Facility or any similar institution licensed under the laws of any other state, territory, or foreign country." The California licensing statute defines an SNF as "a health facility that provides skilled nursing care and supportive care to patients whose primary need is for availability of skilled nursing care on an extended basis." Cal. Health & Safety Code § 1250(c). Among other things, an SNF

in California must have "at least one registered nurse or a licensed vocational nurse, awake and on duty, in the facility at all times, day and night." 22 Cal. Admin. Code § 72329(b)-(d).

Missouri, where Castlewood is located, also licenses SNFs. Under Missouri law, an SNF is

> any premises, other than a residential care facility, assisted living facility, or an intermediate care facility, which is utilized by its owner, operator, or manager, to provide for twenty-four (24) hour accommodation, board and skilled nursing care and treatment services to at least three (3) residents . . . Skilled nursing care and treatment services are those services commonly performed by or under the supervision of a registered professional nurse for individuals requiring twenty-four (24) hours a day care by licensed nursing personnel including acts of observation, care, and counsel of the aged, ill, injured, or infirm, the administration of medications and treatments as prescribed by a licensed physician or dentist, and other nursing functions requiring substantial specialized judgment and skill.

19 Mo. Code of State Regulations § 30-83.010(49).

**[7]** Castlewood has no registered nurses, licensed vocational nurses, or other nurses on its staff. It therefore does not qualify as an SNF under either California or Missouri law.

**[8]** Harlick points out that the Plan covers SNFs licensed in California and "any similar institution licensed under the laws of any other state, territory, or foreign country." She argues that Castlewood is a "similar institution" to an SNF, providing care for mental rather than physical illness. Castlewood may provide mental illness care that is analogous to the physical illness care that is provided in an SNF, but this does

not mean that Castlewood is a "similar institution" to an SNF within the meaning of the Plan. The most natural reading of the Plan's language is that the Plan covers SNFs in California, as well as institutions in other states that provide around-the-clock nursing care for physical illnesses, even if they are given a different name in those states. It was not an abuse of discretion for the Plan administrator to conclude that Castlewood was not an SNF or a "similar institution licensed under the laws of any other state" within the meaning of the Plan.

### B.   Mental Health Parity Act

For the reasons that follow, we conclude that the Mental Health Parity Act mandates that a plan within the scope of the Act provide all "medically necessary treatment" for "severe mental illnesses," and that Harlick's residential care at Castlewood was medically necessary.

### 1.   Overview of the Act

**[9]** The California Mental Health Parity Act ("Parity Act" or "Act") was enacted in 1999. In enacting the statute, the California legislature found that "[m]ost private health insurance policies provide coverage for mental illness at levels far below coverage for other physical illnesses." 1999 Cal. Legis. Serv. ch. 534 (A.B.88), § 1 (West). The legislature further found that coverage limitations had resulted in inadequate treatment of mental illnesses, causing "relapse and untold suffering" for people with treatable mental illnesses, as well as increases in homelessness, increases in crime, and significant demands on the state budget. *Id.*

To combat this disparity, the Parity Act provides, in pertinent part:

> (a) Every health care service plan contract issued, amended, or renewed on or after July 1, 2000, that provides hospital, medical, or surgical coverage *shall*

*provide coverage for the diagnosis and medically necessary treatment of severe mental illnesses* of a person of any age . . . under the same terms and conditions applied to other medical conditions as specified in subdivision (c).

(b) These benefits shall include the following:

    (1) Outpatient services.

    (2) Inpatient hospital services.

    (3) Partial hospital services.

    (4) Prescription drugs, if the plan contract includes coverage for prescription drugs.

(c) The terms and conditions applied to the benefits required by this section, that shall be applied equally to all benefits under the plan contract, shall include, but not be limited to, the following:

    (1) Maximum lifetime benefits.

    (2) Copayments.

    (3) Individual and family deductibles.

(d) For the purposes of this section, "severe mental illnesses" shall include:

. . . .

    (8) Anorexia nervosa.

        . . . .

Cal. Health & Safety Code § 1374.72 (emphasis added). It is undisputed that Harlick's Plan "provides hospital, medical, or surgical coverage" and so comes within the scope of the Act.

**[10]** Subsection (a) contains the Act's basic mandate. Briefly summarized, subsection (a) states that all plans that come within the scope of the Act "shall provide coverage for . . . medically necessary treatment of severe mental illnesses," including anorexia nervosa. That is, if treatment for a "severe mental illness" is "medically necessary," a plan that comes within the scope of the Act must pay for that treatment. Subsection (a) contains only one limitation on the basic mandate that coverage be provided for "medically necessary treatment of severe mental illnesses": such coverage must be provided "under the same terms and conditions applied to other medical conditions as specified in subdivision (c)." The parties agree that the phrase "terms and conditions" refers to monetary conditions, such as copayments and deductibles. Thus, plans need not provide more generous financial terms for coverage for severe mental illnesses than they provide for coverage of physical illnesses. For instance, if a plan has a twenty dollar deductible for each office visit to treat a physical illness, it may also have a twenty dollar deductible for each office visit to treat a severe mental illness.

Subsection (b) states that "[t]hese benefits" must be offered by a plan that comes within the scope of the Act, and lists four specific required benefits. The wording of subsection (b) is potentially confusing. The phrase "*these* benefits" suggests that subsection (b) refers back to subsection (a), but subsection (a) never uses the word "benefits." Harlick contends, and Blue Shield does not dispute, that the phrase "these benefits" refers to the phrase "coverage for the diagnosis and medically necessary treatment." Thus, the required coverage "shall include" all the benefits listed in subsection (b) — outpatient, inpatient, and partial hospital services, and, in some circumstances, prescription drug services. As we discuss below, the list of benefits in subsection (b) is not exhaustive.

Subsection (c) gives three illustrative examples of "terms and conditions" that must apply equally to coverage for mental and physical illnesses: maximum lifetime benefits, copayments, and deductibles. As explained above, the parties agree that "terms and conditions" refers only to financial terms and conditions.

Finally, subsection (d) lists nine "severe mental illnesses" for which coverage for "medically necessary treatment" is mandated. Mental illnesses that are not "severe" are not included in the Parity Act. Anorexia nervosa is one of the listed severe mental illnesses.

**[11]** In summary, plans that come within the scope of the Act must cover all "medically necessary" treatment for "severe mental illnesses," including the nine illnesses specifically listed, but can apply the same financial conditions — such as deductibles and lifetime benefits — that are applied to coverage for physical illnesses.

### 2.   Benefits Required under the Parity Act

**[12]** Blue Shield contends that residential care is not a benefit that it must provide under the Parity Act for a severe mental illness, even if such care is medically necessary. The district court did not reach this question. Because the parties presented the question both to the district court and to us, and because the record is developed, it is appropriate for us to reach it. *See Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1117-18 (9th Cir. 2002).

### a.   Statutory and Regulatory Text

**[13]** We begin with the text of the Parity Act and its implementing regulation. *See United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008). Subsection (b) of the Act provides that "benefits shall include" outpatient services, inpatient hospital services, partial hospitalization services, and prescription

drugs if the plan includes coverage for prescription drugs. Thus, the coverage required under subsection (a) must include, at a minimum, those four treatments. Subsection (b) does not mention "residential care" as a covered benefit, so a threshold question is whether the list of benefits in subsection (b) is an exhaustive list of treatments that can qualify as "medically necessary."

Subsection (b) of the Act says that benefits "shall include" the four listed treatments, but it does not explicitly say whether the list is exhaustive. By contrast, the list of "terms and conditions" in subsection (c) of the Act is explicitly characterized as a non-exhaustive list. Cal. Health & Safety Code § 1374.72(c) ("The terms and conditions . . . shall include, but not be limited to, the following."). At least two district courts have concluded that the difference in wording means that the list of benefits in subsection (b) is exhaustive. *Wayne W. v. Blue Cross of Cal.*, No. 1:07-CV-00035, 2007 WL 3243610, at *4 (D. Utah Nov. 1, 2007); *Daniel F. v. Blue Shield of Cal.*, No. C09-2037, 2011 WL 830623, at *8-9 (N.D. Cal. Mar. 3, 2011).

**[14]** However, the California Department of Managed Health Care ("DMHC"), promulgated a regulation implementing the Parity Act in 2003. The regulation makes clear that the list of benefits in subsection (b) of the Act is not exhaustive. The regulation provides:

> The mental health services required for the diagnosis, and treatment of conditions set forth in Health and Safety Code section 1374.72 [the Parity Act] shall include, when medically necessary, all health care services required under the Act *including, but not limited to*, basic health care services within the meaning of Health and Safety Code sections 1345(b) and 1367(i), and section 1300.67 of Title 28.

28 Cal. Admin. Code § 1300.74.72(a) (emphasis added). The words "including, but not limited to" in the regulation suggest

that the list of benefits in subsection (b) of the Act, as well as the "basic health care services" specified in the regulation, are illustrative rather than exhaustive.

Blue Shield agrees that the list of four benefits specified in subsection (b) of the Parity Act is not exhaustive and that it is required to provide additional services under § 1300.74.72 that are not listed in subsection (b). (That is, Blue Shield disagrees with the two district courts, *supra*, that have concluded that the list in subsection (b) is exhastive.) Subsection (b) of the Parity Act specifies only the following as required benefits: "(1) Outpatient services. (2) Inpatient hospital services. (3) Partial hospital services. (4) Prescription drugs, if the plan contract includes coverage for prescription drugs." Cal. Health & Safety Code § 1374.72(b). Blue Shield recognizes that the Parity Act's implementing regulation specifies that all the benefits listed in California Health & Safety Code § 1345(b) are covered by the Parity Act, in addition to the four benefits specified in part (b) of the Act. Section 1345(b) was originally passed as part of the Knox-Keene Act of 1975, which requires basic services appropriate to physical illnesses. In its current form, § 1345(b) provides:

> "Basic health care services" means all of the following:
>
>> (1) Physician services, including consultation and referral.
>>
>> (2) Hospital inpatient services and ambulatory care services.
>>
>> (3) Diagnostic laboratory and diagnostic and therapeutic radiologic care services.
>>
>> (4) Home health care services.
>>
>> (5) Preventive health services.

(6) Emergency health care services, includ-ing ambulance and ambulance transport services and out-of-area coverage. . . .

(7) Hospice care pursuant to Section 1368.2.

Despite the mandate in section (a) of the Parity Act of coverage for "medically necessary treatment of severe mental ill-nesses, and despite its recognition that the list of mandated benefits in section (b) of the Act is not exhaustive, Blue Shield argues that the Act and its implementing regulation do not require coverage of all "medically necessary treatment for severe mental illnesses." Blue Shield argues for a three-prong test that would determine whether a "medically necessary" treatment must be covered. Blue Shield argues in its brief that "a particular 'medically necessary' treatment must be pro-vided for the treatment of severe mental illness if: (1) it is a level of care specified in subsection (b) of the Parity Act; (2) it is a 'basic health care service' required under Cal. Health & Safety Code § 1345(b) . . . ; *or* (3) it is an additional (non-mandated) benefit that the plan has chosen to provide for the treatment of physical conditions."

Blue Shield supports its argument by citing the Parity Act's implementing regulation, which we quoted above. Blue Shield writes in its brief that this regulation

states that the mental health services required under the Parity Act "shall include, when medically neces-sary, all health care services *required under the [Knox-Keene] Act*, including, but not limited to, *basic health care services* within the meaning of [the statutory provisions]."

(quoting § 1300.74.72(a); italics, "*[Knox-Keene]*", and "[the statutory provisions]" added by Blue Shield). The Knox-Keene Act regulates insurance coverage of physical illness,

without restriction on the type or severity of the illness. Unlike the Parity Act, it is not limited to "severe" illnesses. The Knox-Keene Act does not mandate coverage of all medically necessary treatments for physical illnesses. Cal. Health & Safety Code §§ 1345(b), 1367(i); 28 Cal. Admin. Code § 1300.67. Blue Shield contends that under the regulation, coverage mandated by the Parity Act for severe mental illnesses is no greater than coverage mandated by the Knox-Keene Act for physical illnesses.

The regulation implementing the Parity Act does not specify whether the "Act" to which it refers without specification is the Knox-Keene Act or the Parity Act. We are willing to assume, as Blue Shield assumes, that the word "Act" refers to the Knox-Keene Act. Administrative Code § 1300.45 provides definitions for terms used in health care regulations. Section 1300.45(a), promulgated in 1976, defines "Act" to mean "the Knox-Keene Health Care Service Plan Act of 1975." *See also Arce v. Kaiser Foundation Health Plan, Inc.*, 181 Cal. App.4th 471, 492 (2010) (inserting "Knox-Keene" in brackets when quoting § 1300.74.72(a)). *But see Daniel F. v. California Physicians' Service,* 2009 WL 2581303 at *6 (N.D.Cal. Aug. 20, 2009)) (observing that § 1300.74.72(a) "provides that the mental health services required under § 1374.72 shall include all health care services required under the *Parity Act*" (emphasis added)). But it does not follow that the coverage for severe mental illnesses mandated by the Mental Health Parity Act is restricted to the coverage for physical illnesses mandated by the Knox-Keene Act.

The implementing regulation for the Parity Act provides, as noted above, that the mandated coverage of the Parity Act "shall include, when medically necessary, all health care services required under the Act, *including but not limited to*, basic health care services within the meaning of § 1345(b)[.]" § 1300.74.72(a) (emphasis added). In quoting the regulation, Blue Shield plays down the importance of the phrase "including but not limited to" by italicizing the words preceding and

following that phrase. But the phrase is critical. It makes clear that the Parity Act mandates coverage of the "basic health care services" appropriate to physical illnesses specified in § 1345(b), and that the Parity Act's mandated coverage for severe mental illnesses includes but is not limited to those basic health care services.

During the notice-and-comment process leading up to the promulgation of § 1300.74.72, Blue Shield made the same argument about the mandated coverage of the Parity Act that it now makes to us. The DMHC unambiguously rejected Blue Shield's argument.

Blue Shield wrote to the DMHC during the comment period, stating that it was concerned that the Parity Act might be interpreted to require that a plan cover all "medically necessary treatments." Blue Shield wrote:

> [W]e are concerned that the language in proposed subsection (a) [of the proposed regulation] could be construed to require the plan to provide coverage for any and all medically necessary services for [covered mental health conditions] notwithstanding that the services are not basic health services and are not otherwise covered by the enrollees benefit plan for other conditions (e.g., residential treatment, prescription drugs if not otherwise covered, etc). Therefore, we would recommend that a more direct approach be taken with respect to this provision and would offer the following as replacement language for subsection (a):
>
> > "The health services required to be provided by a plan for an enrollee with a severe mental illness . . . shall include all benefits and services provided to enrollees under the same subscriber contract as for other health conditions. Such coverage shall

> not otherwise be limited only to basic health care services within the meaning of Section 1345(b) of the Act and Section 1300.67 of Title 28."

Letter from Lyle S. Swallow, Associate General Counsel, Blue Shield of California, to Curtis Leavitt, Assistant Chief Counsel, DMHC (Sept. 25, 2002). The language suggested by Blue Shield is the functional equivalent of the language in the third prong of the three-prong test for which it has argued here.

The DMHC responded, rejecting Blue Shield's suggested language. It wrote:

> **REJECT.** Health & Safety Code section 1374.72 requires health plans to provide mental health coverage for specified mental conditions, to the same extent as the health plan covers other medical conditions. The regulation must be read and applied so as to interpret, make specific, or clarify a statute. Given that the statute requires parity in coverage, the commentator's concern is without merit; the regulation requires only that health plans provide mental health coverage in parity with what the plan provides for other medical conditions. The draft regulation language makes clear that plans cannot limit mental health coverage to anything less than what is medically necessary and on parity with other health coverage provided by the plan.

DMHC Mental Health Parity, Responses to Comments, 1st Comment Period, 8/16 – 9/30/2002, at 1.

The DMHC's response clearly rejected Blue Shield's interpretation of the Act, but did not explicitly say that plans had to cover all medically necessary treatment for the listed mental illnesses. But the DMHC's response to other comments

was very explicit on this point. One commentator had suggested that DMHC "should look at developing a list of services specific to mental health care that will capture all those services needed for the state to provide full parity coverage." *Id.* at 2. The DMHC wrote in response:

> **REJECT.** It is not appropriate to list all services that a plan must provide in order to meet the obligations of section 1374.72 [the Parity Act]. Beyond specifying some of the essential services in the amended section 1300.74.72(b), *it is sufficient to state that the plans must provide all medically necessary services. To the extent that certain services are medically necessary, then those services will be provided.*

*Id.* (emphasis added). Another commentator had made a similar suggestion, and the DMHC gave the same response. *See id.* at 18 ("[I]t is not appropriate to list all services, including 'rehabilitative services,' that a plan must provide in order to meet the obligations of section 1374.72. It is sufficient that plans provide all medically necessary services. To the extent that certain rehabilitative services are medically necessary, then those services will be provided.").

If additional demonstration of the incorrectness of Blue Shield's argument is necessary, we point to subsection (b)(4) of the Parity Act. Subsection (b)(4) provides that plans within the scope of the Act must cover "[p]rescription drugs, if the plan contract includes coverage for prescription drugs." The Parity Act thus specifies that a plan need not cover prescription drugs for severe mental illnesses, even if they are medically necessary, unless the plan covers such drugs for physical illnesses. The Parity Act's specific carve-out from the coverage mandate for medically necessary prescription drugs indicates that all other benefits for severe mental illnesses must be provided whenever they are medically necessary, whether or not such benefits are covered for physical illnesses.

Further, Blue Shield's argument lacks support in common sense. Some medically necessary treatments for severe mental illness have no analogue in treatments for physical illnesses. For example, it makes no sense in a case such as Harlick's to pay for time in a Skilled Nursing Facility — which cannot effectively treat her anorexia nervosa — but not to pay for time in a residential treatment facility that specializes in treating eating disorders.

Finally, the Parity Act and the Knox-Keene Act operate in fundamentally different ways. Mandated coverage under the Parity Act applies to nine specified "severe" mental illnesses. The Act does not mandate coverage for non-severe mental illnesses. By contrast, the Knox-Keene Act mandates coverage for all physical illnesses, severe or otherwise. This distinction explains the difference in required coverage under the Parity and Knox-Keene Acts. The Parity Act, which applies to a narrow subset of mental illnesses, requires coverage for all medically necessary treatments for those illnesses. It limits insurer liability by limiting the illnesses to which it applies, not by limiting medically necessary treatments. The Knox-Keene Act, on the other hand, contains no limits on the illnesses for which coverage is required. Rather, it limits insurer liability by limiting medically necessary treatments. Because the Parity Act applies to severe mental illnesses, some of which are life-threatening, it makes sense that the Act requires insurers to cover all medically necessary treatments. It makes equal sense that the Knox-Keene Act, which applies to the full range of physical illnesses, does not require insurers to cover all medically necessary treatments.

Although there is no caselaw directly on point, a recent opinion by a California Court of Appeal supports our conclusion. In *Arce v. Kaiser Foundation Health Plan*, the issue was the certification of a plaintiff class in a suit under the Parity Act. The court had no occasion to explicitly hold that the phrase "medically necessary treatment" in the Parity Act means *all* medically necessary treatment, but the court's anal-

ysis appears to assume that this is the meaning of the Act. The court wrote:

> In sustaining [Kaiser's] demurrer, it appears that the trial court assumed that Arce could only prove a violation of the Mental Health Parity Act if he could demonstrate that the therapies at issue were medically necessary for the putative class members and that Kaiser denied coverage based on a determination that they were not. While that is one means of establishing a violation [of] the statute, it is not the exclusive means. It is possible that Arce also could prove a statutory violation by showing that Kaiser categorically denies coverage for mental health care services that may, in some circumstances, be medically necessary . . . for its individual plan members.

181 Cal. App. 4th at 493.

b.    Positions Taken by the Department of Managed Health Care

**[15]** Blue Shield contends that the California Department of Managed Health Care ("DMHC") has taken the position that the Parity Act does not mandate that all "medically necessary treatments" for enumerated "severe mental illnesses" be covered. It is more accurate to say that the DMHC has taken more than one position on this issue.

Under California law, the deference a court should accord to an agency's interpretation of a statute is "fundamentally situational." *Yamaha Corp. of Am. v. State Bd. of Equalization*, 19 Cal. 4th 1, 12 (1998) (emphasis omitted). Judicial deference to an agency's interpretation "turns on a legally informed, commonsense assessment of [its] contextual merit." *Id.* at 14. A court should consider factors "indicating that the agency has a comparative interpretive advantage over the courts" and factors "indicating that the interpretation in ques-

tion is probably correct." *Id.* at 12 (internal quotation marks and citation omitted). An agency will have a comparative advantage over courts, for example, if the subject matter of the statute is especially technical or complex, or if the agency is interpreting its own regulation. *Id.* An agency's interpretation is more likely to be correct when the interpretation has gone through formal notice-and-comment rulemaking, when there are "indications of careful consideration by senior agency officials," or when the agency has maintained a consistent interpretation over time. *Id.* at 13.

We discussed above the DMHC's statements during the notice-and-comment process leading up to the promulgation of § 1300.74.72 that the Act mandates that plans cover all "medically necessary treatments" for "severe mental illnesses." We will not repeat that discussion here.

Blue Shield contends that the DMHC has taken a contrary position on three occasions. First, Blue Shield points to *Consumer Watchdog v. California DMHC*, No. BS121397 (Super. Ct. Cal. filed June 30, 2009), in which the DMHC demurred to a complaint seeking coverage of medically necessary treatment for autism by providers not licensed in California. The DMHC described the question presented as follows:

> Petitioners allege the Department *must* order plans to cover all medically necessary ABA therapy where it is provided by a professional who is unlicensed in California. Does the law command the Department to order coverage in every such extreme case?

Memorandum of Points and Authorities in Support of Demurrer at 1, *Consumer Watchdog*, No. BS121397 (Super. Ct. Cal. Aug. 7, 2009). The DMHC argued that the Parity Act did not require coverage of treatment for autism when the provider was unlicensed, even if the treatment was medically necessary.

Positions taken by an agency for purposes of litigation ordinarily receive little deference under California law. *See Yahama*, 19 Cal. 4th at 23-24 (citing *Culligan Water Conditioning v. State Bd. of Equalization*, 17 Cal. 3d 86 (1976)). This is particularly so where, as here, the agency adopts a litigating position that is inconsistent with an interpretation it has previously expressed. *See Yamaha*, 19 Cal. 4th at 13. Moreover, the DMHC put forth no persuasive arguments in support of its position in the demurrer. Our skepticism about the DMHC's litigating position was shared by the Superior Court, which overruled the demurrer and held that the Act requires that plans cover medically necessary treatment by unlicensed providers "unless they have licensed providers who will provide the same services." Decision on Demurrer at 7, *Consumer Watchdog*, No. BS121397 (Super. Ct. Cal. Oct. 20, 2009). Although somewhat cryptic, a later decision on a writ of mandate in the same case appears to be consistent with the decision on the demurrer. Decision Re: Petition for Writ of Mandate, *Consumer Watchdog*, No. BS121397 (Super. Ct. Cal. Dec. 20, 2010).

Second, Blue Shield points to a survey conducted in 2005 by the DMHC as part of a "preliminary analysis on mental health parity." Problems identified in the survey included a lack of high-quality residential treatment centers for eating disorders, as well as "significant variation" in plan coverage of residential care for such disorders. Seven plans were studied, though the coverages of only six were described. One plan had "made a policy decision that, under parity, [residential treatment center] services are covered for all age groups and are comparable to skilled nursing home facility services." Four plans covered residential treatment as an optional benefit. One plan did not "routinely" offer residential treatment coverage; under this plan, residential treatment coverage was not a benefit "for most enrollees."

Blue Shield argues that if the DMHC had interpreted the Parity Act to require residential care, it would have ordered

all seven plans to cover such care. We are not convinced that this is so. The DMHC was conducting a survey of residential treatment coverage as part of a larger preliminary study of mental health parity. The study was not — and was not designed to be — an enforcement proceeding.

Third, Blue Shield points to the May 25, 2007, letter from DMHC Senior Counsel Andrew George to Harlick. After reviewing a complaint from Harlick's mother Robin Watson about Blue Shield's refusal to cover Harlick's care at Castlewood, George wrote:

> After reviewing all of the information submitted, we are unable to direct Blue Shield to cover these services. According to the terms of your health plan contract, . . . residential care is excluded from coverage. As Castlewood is licensed as a residential treatment center, rather than an acute in-patient facility, Blue Shield is not obligated to provide coverage for this treatment.

Blue Shield argues that George's letter shows that the Parity Act does not mandate coverage for medically necessary treatment for anorexia nervosa in a residential care facility.

Blue Shield misunderstands the scope of the DMHC's review and the purpose of George's letter. Upon request, the DMHC will review a plan's refusal to cover care based on a determination that the care was not medically necessary. *See* Cal. Health & Safety Code § 1374.30(b), (d). This review is called an "independent medical review." *Id.* Such a review deals solely with the question whether treatment was medically necessary for a particular patient. *Id.* The DMHC does not decide whether a plan should generally cover a particular treatment. *Id.*

It is clear that George's review of Harlick's complaint was an "independent medical review" under § 1374.30. Watson

sent the complaint on April 9, 2007, and it was forwarded to the DMHC on April 19, 2007. On April 24, 2007, the DMHC sent Blue Shield an "Independent Medical Review Request for Health Plan Information" questionnaire. The cover sheet said, "The Department of Managed Health Care has received the attached request for an Independent Medical Review." On April 30, Blue Shield employee Carolyn Garner sent a letter to Harlick noting her "understanding that you have submitted an Application for Independent Medical Review to the California Department of Managed [H]ealth Care." On May 15, George sent a letter of inquiry to Blue Shield. The letter focused on medical necessity. It never mentioned the Parity Act. On May 23, Blue Shield employee Joan Russo wrote a letter to George explaining that the refusal to cover the treatment was based on the terms of the Plan. Her letter never mentioned the Parity Act. Once George learned that Blue Shield's refusal was a coverage decision, he sent a letter terminating the review two days later, on May 25. This letter, too, never mentioned the Parity Act. George's May 25 letter establishes only that the DMHC terminated its "independent medical review" under § 1374.30 once it determined that Blue Shield's denial was not based on a lack of medical necessity. It does not establish that the DMHC approved of Blue Shield's decision not to cover residential care at all.

### c.    Summary

**[16]** We conclude that the most reasonable interpretation of the Parity Act and its implementing regulation is that plans within the scope of the Act must provide coverage of all "medically necessary treatment" for "severe mental illnesses" under the same financial terms as those applied to physical illnesses.

### C.    Medical Necessity in Harlick's Case

**[17]** The remaining question is whether Harlick's residential care at Castlewood was medically necessary. Blue Shield,

as the plan administrator, normally makes the medical necessity determination in the first instance. *Sarchett v. Blue Shield of Cal.*, 43 Cal. 3d 1, 9-10 (1987). Blue Shield did not dispute that treatment at Castlewood was medically necessary until supplemental briefing filed after oral argument in this Court. Blue Shield now argues that it should be allowed to reopen its administrative process in order to determine whether Harlick's residential care was medically necessary.

An ERISA plan administrator who denies a claim must explain the "specific reasons for such denial" and provide a "full and fair review" of the denial. 29 U.S.C. § 1133. The administrator must also give the claimant information about the denial, including the "specific plan provisions" on which it is based and "any additional material or information necessary for the claimant to perfect the claim." 29 C.F.R. § 2560.503-1(g). A plan administrator may not fail to give a reason for a benefits denial during the administrative process and then raise that reason for the first time when the denial is challenged in federal court, unless the plan beneficiary has waived any objection to the reason being advanced for the first time during the judicial proceeding.

Nevertheless, Blue Shield contends that remand is required under *Vizcaino v. Microsoft Corporation*. 120 F.3d 1006 (9th Cir. 1997) (en banc). Blue Shield misreads *Vizcaino*. In that case, the plan administrator had failed to give a particular reason for its denial of benefits under the plan, but the plaintiffs explicitly waived, in both the district court and the court of appeals, any objection to that reason being asserted in federal court in defense of the administrator's denial. Indeed, after initially objecting in the district court, plaintiffs "urged the magistrate judge to address" the plan administrator's late-raised argument. *Vizcaino v. Microsoft Corp.*, 97 F.3d 1187, 1193 (9th Cir. 1996) (panel decision). The plaintiffs took the same position on appeal. *Vizcaino*, 120 F.3d at 1013. We therefore allowed the late-raised reason to be urged in support

of the administrator's denial, but remanded for the administrator to evaluate the reason in the first instance. *Id.* at 1014.

**[18]** The general rule, both before and after *Vizcaino*, in this circuit and in others, is that a court will not allow an ERISA plan administrator to assert a reason for denial of benefits that it had not given during the administrative process. We wrote recently:

> Requiring that plan administrators provide a participant with specific reasons for denial "enable[s] the claimant to prepare adequately for any further administrative review, as well as appeal to the federal courts." "[A] contrary rule would allow claimants, who are entitled to sue once a claim has been 'deemed denied,' to be 'sandbagged' by a rationale the plan administrator adduces only after the suit has commenced."

*Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192, 1199 n.2 (9th Cir. 2010) (quoting *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (9th Cir. 1992), and *Jebian v. Hewlett-Packard Co., Employee Benefits Org. Income Prot. Plan,* 349 F.3d 1098, 1104 (9th Cir. 2003)). ERISA and its implementing regulations are undermined " 'where plan administrators have available sufficient information to assert a basis for denial of benefits, but choose to hold that basis in reserve rather than communicate it to the beneficiary.' " *Id.* (quoting *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 129 (1st Cir. 2004)).

**[19]** During the administrative process, Blue Shield never said that it was denying Harlick's claims on the ground that treatment at Castlewood was not medically necessary. Only once during its extensive communication with Harlick and Watson did Blue Shield even suggest that medical necessity might be an issue. In a letter containing other errors, one Blue Shield employee said that coverage for treatment at Castle-

wood was denied in part because medical necessity had not been established for a four-month period. But in a letter a few weeks later, a different Blue Shield employee reiterated that Castlewood was not covered because it was a residential facility. From that time on, Harlick was told only that Blue Shield would not pay for her care at Castlewood because her coverage did not extend to residential care. Blue Shield Senior Manager in the Law Department, Joan Russo, explained in a letter to Watson:

> The Plan is not arguing that Jeanene was not in need of care and treatment for her condition. However, it is the Plan's position that Jeanene was in a residential treatment program at Castlewood and according to the terms of her Shield Spectrum PPO Plan, residential care is not covered.

Blue Shield also told the DMHC that the denial was not based on medical necessity. During the independent medical review, George sent Blue Shield a form about the claim denial. The form began, "The health plan's reason for the denial was based on which of the following determinations: (Check the appropriate boxes) — Benefit/Coverage, Experimental/Investigational Treatment, Medical Necessity, ER/Urgent Care Reimbursement." Blue Shield checked "Benefit/Coverage," but did not check "Medical Necessity." George terminated the "independent medical review" because such a review deals only with medical necessity, and Blue Shield had not raised any issue of medical necessity.

Blue Shield had discretion to determine whether treatment was medically necessary during the administrative review process of Harlick's claim. But Blue Shield had to tell Harlick the "specific *reasons* for the denial" — not just one reason, if there was more than one — and provide a "*full* and fair review" of the denial. 29 U.S.C. § 1133 (emphases added). Blue Shield told both Harlick and her mother, as well as the DMHC, that medical necessity was not the reason for its

denial of Harlick's claim. It cannot now bring out a reason that it has "held in reserve" and commence a new round of review. *See Mitchell*, 611 F.3d at 1199 n.2.

**[20]** Given that Harlick's doctors believed that outpatient treatment was insufficient, that Harlick entered Castlewood at 65% of her ideal body weight, and that Harlick needed a feeding tube while at Castlewood, it appears that inpatient residential treatment was indeed necessary. But we need not decide that question. By failing to assert during the administrative process that medical necessity was a reason for denying Harlick's claim, Blue Shield forfeited the ability to assert that defense in the litigation now before us.

## Conclusion

**[21]** Harlick's Plan does not itself require that Blue Shield pay for residential care at Castlewood for her anorexia nervosa. However, California's Mental Health Parity Act provides that Blue Shield "shall provide coverage for the diagnosis and medically necessary treatment" of "severe mental illnesses," including anorexia nervosa, for plans coming within the scope of the Act. It is undisputed that Harlick's plan comes within the scope of the Act. Blue Shield is foreclosed from asserting that Harlick's residential care at Castlewood was not medically necessary. We therefore conclude that Blue Shield is obligated under the Parity Act to pay for Harlick's residential care at Castlewood, subject to the same financial terms and conditions it imposes on coverage for physical illnesses.

**REVERSED.**

---

N.R. SMITH, Circuit Judge, dissenting in part and concurring in part:

In our original opinion, we interpreted the word "Act" in the Parity Act's 2003 implementing regulation (Cal. Code

Regs. tit. 28, § 1300.74.72(a)) to refer to the "Parity Act." *See Harlick v. Blue Shield of California*, 656 F.3d 832, 845 (9th Cir. 2011). In my view, this interpretation of the word "Act" provided the lynchpin for our conclusion that the Parity Act was not limited by the provisions of the Knox–Keene Act. Therefore, we determined that the Parity Act mandated coverage for all "medically necessary" services by medical insurers. However, in Blue Shield's Petition for Rehearing and Petition for Rehearing En Banc, Blue Shield argued for the first time that California's Administrative Code Section 1300.45(a) (promulgated in 1976) defines "Act" to mean "the Knox–Keene Health Care Service Plan Act of 1975." *See* Cal. Code Regs. tit. 28, § 1400.45(a).

After consideration of this argument, the panel now unanimously agrees that we incorrectly interpreted the text of the Parity Act's implementation regulation in our original opinion. The majority's amended opinion reflects our change in interpretation. *See* Revised Maj. Op. 6199 ("We are willing to assume, as Blue Shield assumes, that the word 'Act' refers to the Knox–Keene Act."). Yet despite this significant change in our textual interpretation, the majority remains convinced that our original interpretation of the Parity Act was still correct based on conflicting legislative history and "common sense." Revised Maj. Op. 6203.

I see it differently and am surprised by the majority's conclusion. Once we agree that the word "Act" is referencing the Knox–Keene Act, the majority's conclusion that "it does not follow that the coverage for severe mental illnesses mandated by the Mental Health Parity Act is restricted to the coverage for physical illnesses mandated by the Knox-Keene Act," is a non sequitur. Revised Maj. Op. 6199. This reference acts as a statutory limit on the type of benefits that insurers are required to cover. Thus, only the interpretation of the Parity Act that adheres to this text is appropriate. Under this interpretation, an insurer need only provide services specifically required under the Parity Act and its implementing regulation,

unless the insurer has voluntarily chosen to provide a non-mandated benefit for a physical condition and must therefore offer additional mental health benefits in parity with that coverage. Accordingly, "medical necessity" is necessary, but not independently sufficient for mental health coverage.

## I.    The Text of the Parity Act and Its Implementing Regulation

The Parity Act was passed in 1999, because "most private health insurance policies provide coverage for mental illness at levels far below coverage for other physical illnesses." 1999 Cal. Stat. 3701. Thus, the Parity Act sought to ensure that mental health coverage would be provided in parity, or equal measure, as physical health coverage. As the majority has correctly summarized, all plans (coming within the scope of the Act) were mandated to provide coverage for "medically necessary treatment of severe mental illnesses." Cal. Health & Safety Code § 1374.72(a). Subsection (b) of Section 1374.72 provides that "benefits shall include" outpatient services, inpatient hospital services, partial hospitalization services, and prescription drugs if the plan includes coverage for prescription drugs. Thus, the majority correctly notes that the important "threshold question is whether the list of benefits in subsection (b) is an exhaustive list of treatments that can qualify as 'medically necessary.' " Revised Maj. Op. 6196.

The majority notes that at least two district courts have interpreted language, similar to section (b) language, to indicate an exhaustive list. Revised Maj. Op. 6196 (citing *Wayne W. v. Blue Cross of Cal.*, No. 1:07-CV-00035, 2007 WL 3243610, at *4 (D. Utah Nov. 1, 2007); *Daniel F. v. Blue Shield of Cal.*, No. C09-2037, 2011 WL 830623, at *8-9 (N.D. Cal. Mar. 3, 2011)). Specifically, the district court in *Daniel F.* arrived at a very similar conclusion to the one that Blue Shield advocates here. 2011 WL 830623, at *8 (noting that "the Parity Act does not require that insurers cover residential treatment, and does not *require* coverage for all 'medi-

cally necessary health care service"; rather, only the specific benefits enumerated under the Parity Act are required, as well as benefits voluntarily "provided under a given plan"; thus "if the plan at issue covers hospitalization for physical illness where medically necessary, it must cover hospitalization for mental illness where medically necessary"). I agree that this interpretation is a consistent interpretation of the Parity Act, because the services specifically required under the Parity Act and its implementing regulation are exhaustive, unless the insurer has voluntarily chosen to provide a non-mandated benefit for a physical condition.

However, our original opinion did not adopt this interpretation of the Parity Act's text, given our reading of the Parity Act's implementing regulation as referring to the Parity Act itself, rather than creating a ceiling for benefits to be provided. Specifically, we stated:

> Blue Shield inserted the bracketed phrase "[Knox–Keene]" in its quotation of the regulation. Based on its assumption that the regulation refers to the Knox–Keene Act, Blue Shield argues that coverage under the Parity Act is intended to parallel coverage under the Knox–Keene Act. We believe that Blue Shield misreads the regulation. In our view, the "Act" to which the regulation refers is the Parity Act. . . . Without Blue Shield's alteration, nothing in the text of the statute or the regulation suggests that the scope of the Parity Act is equivalent to the scope of the Knox–Keene Act.

*Harlick*, 656 F.3d at 845.

We now unanimously agree with Blue Shield that "Knox–Keene" in fact does appropriately belong within the brackets. We cannot avoid this interpretation, because California's Administrative Code requires that we interpret the word "Act"

as a reference to the Knox–Keene Act.[1] Cal. Code Regs. tit. 28, § 1400.45(a). Given this change, there *is* support for the interpretation of the Parity Act where "the scope of the Parity Act is equivalent to the scope of the Knox–Keene Act." *Harlick*, 656 F.3d at 845. Accordingly, this change in interpretation should also change our conclusion as to what benefits insurers are required to provide under the Parity Act.

Nevertheless, the majority rejects this obvious interpretation of the statutory text based on its interpretation of "including but not limited to" language in the implementation regulation, which reads as follows:

> The mental health services required for the diagnosis, and treatment of conditions set forth in Health and Safety Code section 1374.72 [the Parity Act] shall include, when medically necessary, all health care services required under the Act *including, but not limited to*, basic health care services within the meaning of Health and Safety Code sections 1345(b) and 1367(i), and section 1300.67 of Title 28.

---

[1] *See also Arce v. Kaiser Found. Health Plan, Inc.*, 104 Cal. Rptr. 3d 545, 564 (2010) (inserting 'Knox–Keene' in brackets when quoting § 1300.74.72(a)). Though this definition section was enacted before the Parity Act's implementing regulation, California law follows "a presumption that the Legislature is aware of an administrative construction of a statute," and this presumption "should be applied if the agency's interpretation of the statutory provisions is of such longstanding duration that the Legislature may be presumed to know of it." *Redevelopment Agency of the City of Long Beach v. Cnty. of L.A.*, 89 Cal. Rptr. 2d 10, 17 n.5 (1999) (quoting *Moore v. Cal.*, 831 P.2d 798, 809 (Cal. 1992)). An "administrative construction of a statute over many years, particularly when it originated with those charged with putting the statutory machinery into effect and enforcing it, is entitled to great weight and will be followed unless clearly erroneous." *Robinson v. Fair Emp't & Hous. Comm'n*, 825 P.2d 767, 785 (Cal. 1987) (internal quotation marks omitted); *see also Misasi v. Jacobsen*, 359 P.2d 282, 284 (Cal. 1961) ("[C]ourts will generally not depart from such an [administrative] interpretation unless it is clearly erroneous.").

Cal. Code Regs. tit. 28, § 1300.74.72(a) (emphasis added). Based on this language alone, the majority argues that the "regulation suggest[s] that the list of benefits in subsection (b) of the Act, as well as the 'basic health care services' specified in the regulation, are illustrative rather than exhaustive." Revised Maj. Op. 6196-97. However, this reading of the regulation ignores the text surrounding the "including, but not limited to" language and also ignores fundamental canons of statutory interpretation.

The text of the Parity Act's implementing regulation suggests that the first portion of subsection (a) ("services required . . . shall include, when medically necessary, all health care services") is being modified by the second portion of subsection (a) ("required under the [Knox–Keene] Act . . . ."). Thus, the second portion of the text limits the scope of the "health care services" that must be provided to the types of benefits provided under the Knox–Keene Act. It is undisputed that the Knox–Keene Act does not require all medically necessary treatment for physical illnesses. *See Kaiser Fdtn. Health Plan, Inc. v. Zingale*, 121 Cal. Rptr. 2d 741, 745 (2002) ("If the Legislature had intended to require every health care service plan that offers a prescription drug benefit to cover all medically necessary prescription drugs or to allow the Department to impose that requirement, it would have been simple for the Legislature to say so."). Thus, viewed in this light, the "when medically necessary" language operates as a necessary (rather than sufficient) condition on the type of benefits that must be provided. In other words, plans must provide the type of benefits the Knox–Keene Act provides when they are medically necessary for mental health.

The majority's current interpretation of the regulation reads out the modifying text: that the benefits must be provided when "required under the [Knox –Keene] Act . . . ." Such a reading contradicts California's longstanding rule against interpreting portions of statutory or regulatory text to be superfluous. *See Wells v. One2One Learning Found.*, 141

P.3d 225, 248 (Cal. 2006) ("[I]nterpretations which render any part of a statute superfluous are to be avoided.").

The "including, but not limited to," language (on which the majority relies) does not contradict this interpretation of the Parity Act. California courts have explained that, while the phrase "including, but not limited to" is admittedly a "phrase of enlargement," this phrase is "not a grant of carte blanche that permits all actions without restriction," and it cannot be used to create an "unreasonable expansion of the legislature's words . . . ." *Wainwright v. Superior Court*, 100 Cal. Rptr. 2d 749, 752-53 (2000); *see also People v. Giordano*, 170 P.3d 623, 634 (Cal. 2007) ("Although the phrase 'including, but not limited to' is a phrase of enlargement, the use of this phrase does not conclusively demonstrate that the Legislature intended a category to be without limits." (internal quotation marks omitted)). Thus, the context surrounding the "including, but not limited to" phrase cannot be ignored when determining the extent of the "enlarging" effect this phrase has on benefits that § 1300.74.72(a) requires insurance companies to provide.

In multiple cases, the California Supreme Court has explained that the "including, but not limited to" phrase must be given a narrow interpretation when it precedes a list of illustrative items that have a similar characteristic. For example, in *People v. Arias*, 195 P.3d 103, 109-10 (Cal. 2008), the California Supreme Court applied the *ejusdem generis* cannon of statutory interpretation (meaning "of the same kind"), to reject a broad interpretation of the "including, but not limited to" proviso. The California Supreme Court explained that when "specific words follow general words in a statute or vice versa . . . the general term or category is restricted to those things that are similar to those which are enumerated specifically." *Id.* at 109 (internal quotation marks omitted). The court explained that, to interpret the "including, but not limited to" phrase to allow items beyond that type, would "render

nugatory the qualifiers that the Legislature purposefully included in that example." *Id.* at 110.

California has other similar cases utilizing the *ejusdem generis* cannon to interpret an "including, but not limited to" statutory phrase in a similar limited fashion. *See, e.g.*, *Kraus v. Trinity Mgmt. Servs., Inc.*, 999 P.2d 718, 734 (Cal. 2000) (limiting the "including, but not limited to" phrase when the legislature "offer[s] as examples peculiar things or classes of things"), *superseded on other grounds by statute as recognized in Arias v. Superior Court*, 209 P.3d 923 (Cal. 2009); *Peralta Comty. Coll. Dist. v. Fair Emp't & Hous. Comm'n*, 801 P.2d 357, 360, 363, 367 (Cal. 1990) (a statute authorizing commission to take "such action" as it believes will effectuate the purposes of the Fair Employment and Housing Act, "including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, and restoration to membership in any respondent labor organization," does not authorize commission to award compensatory damages, because that was not "of the same general nature or class as those enumerated"); *Dyna-Med, Inc. v. Fair Emp't & Hous. Comm'n*, 743 P.2d 1323, 1327, 1329 (Cal. 1987) (holding that the statute did not extend to cover remedies that were "different in kind from the enumerated remedies," because "[a] more reasonable reading of the phrase 'including, but not limited to,' . . . permitting only additional corrective remedies comports with the statutory construction doctrines of *ejusdem generis*, *expressio unius est exclusio alterius* and *noscitur a sociis*.").

The Parity Act's implementing regulation contains a similar situation, where the "including, but not limited to" phrase is followed by a reference to a general term ("basic health care services *within the meaning of*") and then a list of three statutory or regulatory provisions enumerating health services. *See* Cal. Code Regs. tit. 28, § 1300.74.72(a) (emphasis added). The first two provisions (California Health and Safety Code §§ 1345(b) and 1367(i)) are from the Knox–Keene Act

itself, and the second provision (§ 1300.67 of Title 28 of the California Code of Regulations) is a regulation promulgated under the authority of the Knox–Keene Act. Thus, following California's use of the *ejusdem generis* cannon of statutory construction, the illustrative health care services listed are services mandated by the Knox–Keene Act, which suggests that other non-listed services would similarly be of the type required under the Knox–Keene Act. A narrow interpretation of the implementing regulation comporting with *ejusdem generis* mandates only one conclusion: any other services offered beyond what the Knox–Keene Act requires should be interpreted narrowly, and would likely only include those services specifically mandated by the Parity Act or in parity with physical health benefits that have voluntarily been provided by the insurer.

California case law does not support the majority's textual interpretation. The original and revised opinion rely on *Arce*, 104 Cal. Rptr. 3d 545 (2010), arguing that although *Arce* did not explicitly touch on this issue, "the court's analysis appears to assume" that the Act requires "*all* medically necessary treatment . . . ." Revised Maj. Op. 6203-04. While this is not an unreasonable interpretation of *Arce*, the *Arce* holding also appears to be equally consistent with the interpretation of the Parity Act which is mandated by its language (as explained above).

The issue in *Arce* was whether the insurance company had engaged in unlawful conduct by "denying coverage for the diagnosis and treatment of autism spectrum disorders under *the same terms and conditions* applied to other medical conditions." *Arce*, 104 Cal. Rptr. 3d at 565 (emphasis added). The insurance company was arguing that a violation of the Parity Act could *only* occur if it was demonstrated that the "therapies at issue were medically necessary for the putative class . . . ." *Id.* But the court held that a violation could also be shown if the insurance company "categorically denie[d] coverage for mental health care services that may, in some circumstances,

be medically necessary . . . ." *Id.* However, this analysis was focused on a denial of mental health services that led to an unequal provision of coverage compared to physical illnesses, and thus it says nothing of requiring all medically necessary benefits regardless of the physical benefits provided.

Finally, under California law, when a statute requiring the provision of insurance benefits is ambiguous, the statute is not necessarily construed in favor of the insured. Rather, "the statute must be construed to implement the intent of the Legislature and should not be construed strictly against the insurer (unlike ambiguous or uncertain policy language)." *Prudential–LMI Commercial Ins. v. Superior Court*, 789 P.2d 1230, 1236 (1990) (citing *Interinsurance Exch. v. Marquez*, 172 Cal. Rptr. 263, 264 (Cal. 1981)); *see also Ichthys Inc. v. Guarantee Ins. Co.*, 57 Cal. Rptr. 734, 737 (1967)); *Zaragoza v. Ibarra*, 95 Cal. Rptr. 3d 264, 270 (2009).

The purpose of the Parity Act supports an interpretation of the statute requiring only that mental health coverage provided be linked to the physical health coverage provided under the Knox–Keene Act. As discussed above, the Parity Act was enacted in 1999 to address the perceived problem that private health insurance policies provided coverage for mental illness at levels far below coverage for other physical illnesses. *See* 1999 Cal. Stat. 3701. This problem would not be rectified by requiring insurance policies to provide *more* mental health coverage than physical health coverage. Further, the word "parity" itself means "[e]quality, as in amount, status, or value." *The American Heritage College Dictionary* 993 (3d ed. 1997). Therefore, the rationale (and even the name of the Parity Act) indicates that the legislature's goal was to ensure parity in the scope of coverage for services that plans must offer for physical and mental illness.

## II.   The Conflicting Legislative History

Because the Parity Act's statutory and regulatory text no longer supports the majority's interpretation, the majority now

relies primarily on legislative history to justify its holding. But legislative history, often an elusive tool of interpretation, is particularly elusive here. Thus, relying on legislative history here results in the proverbial situation where the majority is "looking over a crowd and picking out its friends." *People v. Seneca Ins. Co.*, 62 P.3d 81, 86 (Cal. 2003) (quoting Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L. Rev. 195, 214 (1983)).

For example, the majority opinion focuses on the various positions the California Department of Managed Health Care ("DMHC") has taken with regard to the implementation regulation. Revised Maj. Op. 6204-06. But there are multiple ways to interpret the inconsistent stances of the DMHC. The revised majority opinion explains that "[d]uring the notice-and-comment process leading up to the promulgation of § 1300.74.72, Blue Shield made the same argument about the mandated coverage of the Parity Act that it now makes to us. The DMHC unambiguously rejected Blue Shield's argument." Revised Maj. Op. 6200. However, it is far from clear that the DMHC's response rejected Blue Shield's argument for the same reason the majority does.

The record shows that, when Blue Shield expressed concern that the regulation might be read to require coverage for all medically necessary care, the DMHC rejected the comment. However, the DMHC rejected the comment, not because it disagreed with Blue Shield, but because the DMHC viewed the regulation as already clearly stating what Blue Shield was requesting. "Given that the statute requires parity in coverage, the commentator's concern is *without merit*; the regulation requires *only* that health plans provide mental health coverage in parity with what the plan provides for other medical conditions. The draft regulation language makes clear that plans cannot limit mental health coverage to anything less than what is medically necessary *and on parity with other health care provided by the plan*." DMHC Mental Health Par-

ity, Responses to Comments, 1st Comment Period, 8/16 – 9/30/2002, at 1 (emphasis added). Notably, the DMHC's response was not that mental health coverage must be provided regardless of whether it was medically necessary *or* on parity with other health care provided by the plan. Thus, medical necessity was not demonstrated as an independent basis for receiving coverage, and the DMHC viewed Blue Shield's concern as "without merit."

Furthermore, when DMHC responded to another commentator by stating that "it is sufficient to state that the plans must provide all medically necessary services," DMHC was responding to a commentator's suggestion that "a list of services specific to mental health" be developed so that all services needed "to provide *full parity coverage*" would be available. *Id.* at 2 (emphasis added). The commentator was arguably asking for a list of mental health benefits to be provided in parity, or equal measure, to physical health coverage. The commentator was clearly not asking for coverage of all medically necessary mental health benefits without limit.

In addition, the majority opinion dismisses the DMHC's "Mental Health Parity in California Survey" (the "Survey"),[2] because the "study was not—and was not designed to be—an enforcement proceeding." Revised Maj. Op. 6207. While that is true, this does not necessarily preclude the Survey from providing support for Blue Shield's argument.

The Survey was implemented as part of the DMHC's authority to regulate and monitor managed health plans in response to questions by legislators and consumers about "whether parity between medical and mental health care had been achieved." The Survey results "did not identify disparities between the contractual terms and conditions used for medical versus mental health coverage, as disclosed in the Evidence of Coverage ("EOC"). Further, the Survey found no

---

[2]The Survey began in 2004 and provided results in 2005.

pattern of plans denying services for mental health conditions that would be covered for other medical conditions." Based on its findings, the DMHC immediately required the plans to take corrective action on several issues—none of which related to the types of services provided or to residential care. Moreover, the Survey discussed the plans' use of residential care at some length. It noted that often only part of the residential care is covered; that "plans offer a choice of benefit packages both with and without RTC benefits"; that of the seven insurers, four plans offered RTC coverage as an optional benefit, and only one covered it on equal terms with skilled nursing facilities.

The Survey specifically considered the EOC documents from the health plans and found no violation of the Parity Act. The Survey made this finding, despite Blue Shield's plan[3] which allowed treatment in a SNF, but expressly excluded residential care.

The majority opinion also diminishes the importance of DMHC's response to a letter written by Robin Watson (Harlick's mother), by categorizing it as a request for an Independent Medical Review ("IMR"). Revised Maj. Op. 6207. In this letter, DMHC Senior Counsel Andrew George explained that "Blue Shield is not obligated to provide coverage for [Harlick's] treatment." However, neither Watson's letter nor the letters from the DMHC indicate that Watson's letter was either a request for an IMR (it never mentioned medical necessity) or was treated as such. Even if an IMR is limited to considerations of medical necessity, that limitation may be inapplicable. *See* Cal. Health & Safety Code § 1374.30(b). Instead, the DMHC help center referred to it as a complaint. Aside from an IMR, "[a]ll other enrollee grievances, including grievances involving coverage decisions, remain eligible for review by the department pursuant to subdivision (b) of

---

[3]Harlick has not challenged Blue Shield's assertion that it was included in the Survey, even though the Survey does not list the plans considered.

Section 1368." Cal. Health & Safety Code § 1374.30(d)(1). According to the DMHC's website, even a request for an IMR, if inappropriate, will be handled as a grievance. Department of Managed Health Care, "Questions and Answers about IMR" http://www.dmhc.ca.gov/dmhc_consumer/pc/pc_imrqa.aspx (last visited May 3, 2012) (explaining that if a problem does not qualify as an IMR, "the Help Center will review your case through its regular complaint process and send you a written decision within 30 days").

Section 1368 provides that, after an enrollee has completed the plan's grievance process, she may "submit the grievance to the department for review." Cal. Health & Safety Code § 1368(b)(1)(A). As here, the department "shall review the written documents submitted with the subscriber's or the enrollee's request for review" and "may ask for additional information." *Id.* § 1368(b)(3). The department will then "send a written notice of the final disposition of the grievance, and the reasons therefor, to the subscriber," which will include "[a] summary of its findings and the reasons why the department found the plan to be, or not to be, in compliance with any applicable laws, regulations, or orders of the director." *Id.* § 1368(b)(5).

It is true that George's response to Watson's complaint did not explicitly address whether Blue Shield's denial complied with the Parity Act. However, Watson's letter to the DMHC specifically alleged that "Jeanene is protected by the *CA Parity Law* and the insurance company is not paying the claims." After reviewing the information submitted, the DMHC concluded that "Blue Shield has complied with its responsibilities under applicable health plan law regarding your request." It did not limit this conclusion to any particular law, and it is likely that George considered the Parity Act in his analysis. George was also one of the contributors to the Survey.[4]

---

[4]As a contributor, it is not likely that George was either (1) unfamiliar with the parity law that Watson challenged or (2) unfamiliar with the Sur-

## III.  Conclusion

As discussed above, the Knox–Keene Act does not require all medically necessary treatment for physical illnesses. *See Kaiser*, 121 Cal. Rptr. 2d at 745. Thus, to keep in parity with those benefits, it makes sense that the Parity Act would also not offer them. Therefore, I must dissent because (1) the statutory and regulatory text most clearly support a statutory interpretation linking the scope of coverage provided under the Parity Act to the Knox–Keene Act, and (2) the statute's purpose and legislative history provide equal (if not more) support to this interpretation, rather than the majority's interpretation.

---

vey's earlier conclusion that excluding residential treatment did not violate the parity law. His conclusion that Blue Shield complied with the law thus may indicate support for Blue Shield's interpretation.